COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
JOHN J. STOIA, JR. (141757)
THEODORE J. PINTAR (131372)
RACHEL L. JENSEN (211456)
STEVEN M. JODLOWSKI (239074)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
jstoia@csgrr.com
tpintar@csgrr.com
rjensen@csgrr.com
sjodlowski@csgrr.com

BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
ANDREW S. FRIEDMAN
KIMBERLY C. PAGE
MICHAEL C. McKAY
2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012
Telephone: 602/274-1100
602/274-1199 (fax)
afriedman@bffb.com
kpage@bffb.com
mmckay@bffb.com

Co-Lead Class Counsel
[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| VIDA F. NEGRETE, as Conservator for EVERETT E. OW, an individual, on Behalf of All Other Similarly Situated Persons,<br><br>Plaintiff,<br><br>vs.<br><br>ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA, a Minnesota corporation,<br><br>Defendant. | No. CV-05-6838-CAS(MANx)<br><br><u>CLASS ACTION</u><br><br>PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA'S MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>DATE: September 15, 2008<br>TIME: 10:00 a.m.<br>JUDGE: Hon. Christina A. Snyder<br>CTRM: 5 – 2nd Floor |

[Caption continued on following page.]

**REDACTED PURSUANT TO PROTECTIVE ORDER DATED JULY 20, 2006 AND LOCAL RULE 79-5.1**

| | |
|---|---|
| CAROLYN Y. HEALEY, on Behalf of Herself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA, a Minnesota corporation,<br><br>Defendant. | No. CV-05-8908-CAS(MANx)<br><br><u>CLASS ACTION</u> |

**REDACTED PURSUANT TO PROTECTIVE ORDER DATED JULY 20, 2006 AND LOCAL RULE 79-5.1**

# TABLE OF CONTENTS

Page


I. INTRODUCTION .... 1

II. STATEMENT OF FACTS .... 3

A. The Allianz Deferred Annuity Products at Issue .... 3

1. Allianz's Two-Tier Products at Issue (Bonus Maxxx and MasterDex 10) .... 3

a. Bonus Maxxx .... 3

b. MasterDex 10 .... 3

2. Allianz's Single-Tier Products at Issue (Power 7 and FlexDex Multichoice) .... 4

a. Power 7 .... 4

b. FlexDex Multichoice .... 4

B. The Marketing and Sale of Allianz's Deferred Annuities .... 4

1. Allianz's Scheme to Defraud Seniors .... 4

2. Allianz's Misrepresentations and Omissions .... 6

a. Allianz's Purported "Bonus" Is Illusory .... 6

b. Teaser Yields .... 7

c. Allianz's Undisclosed Charges .... 8

C. Plaintiffs' Annuity Transactions .... 9

1. Plaintiff Carolyn Healey .... 9

2. Plaintiff Ow .... 10

III. THE STANDARD FOR SUMMARY JUDGMENT .... 12

IV. PLAINTIFFS' EVIDENCE CREATES TRIABLE ISSUES OF FACT SUFFICIENT TO WITHSTAND ALLIANZ'S MOTION FOR SUMMARY JUDGMENT .... 13

A. Allianz Violated the Mail and Wire Fraud Statutes in Multiple Ways .... 13

1. Proof of a Specific Misrepresentation or Omission Is Not Necessary to Show that a Mail Fraud Violation Is the Proximate Cause of Plaintiffs' Injuries .... 13

**Page**


2. Allianz Misrepresented and Concealed Material Adverse Facts About Its Deferred Annuities ..... 14

a. Allianz Had a Duty to Disclose ..... 16

b. Allianz's Misrepresentations and Omissions Are Material ..... 18

B. Triable Issues of Fact Exist Regarding Whether Plaintiffs' Injuries Were Caused by Allianz's RICO Mail Fraud ..... 20

1. Direct Injury, Not Reliance, Is Required ..... 20

2. Plaintiffs Present Ample Evidence of Direct Injury ..... 22

3. Reliance Is Not Required But Present ..... 23

C. Triable Issues of Fact Exist Regarding Whether Plaintiffs Suffered Damages ..... 25

1. Plaintiffs Were Directly Damaged ..... 25

2. Plaintiffs' Damages Are Measurable ..... 27

a. Plaintiffs Incurred Out-of-Pocket Damages ..... 27

b. Plaintiffs Incurred Benefit-of-the-Bargain Damages ..... 28

3. Plaintiffs Are Entitled to Restitution ..... 29

D. Allianz's Filing of Annuity Contracts with the DOIs Does Not Eliminate Triable Issues of Fact as to Whether Plaintiffs Suffered Damages ..... 30

1. The Represented Value of Allianz's Annuities Do Not Carry the DOIs' Imprimatur ..... 31

2. The Filed Rate Doctrine Is Inapplicable ..... 32

V. CONCLUSION ..... 34

## TABLE OF AUTHORITIES

**Page**

### CASES

*Addison v. Am. Med. Secur.*, No. CL 00-01445 AB (Fla. Cir. Ct. 2002) .......... 32

*Ameriquest Mortgage Co. v. Couch*, No. 99-5353, 2000 WL 708404 (E.D. Pa. May 19, 2000) .......... 30

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) .......... 20

*AT&T v. Cent. Office Tel., Inc.*, 524 U.S. 214 (1998) .......... 33

*Avila Group, Inc. v. Norma J. of Cal.*, 426 F. Supp. 537 (S.D.N.Y. 1977) .......... 23

*B&M Nat'l Automation, L.L.C. v. AMX Corp.*, No. 06-20412 CIV, 2007 WL 809675 (S.D. Fla. Mar. 15, 2007) .......... 29

*Bastian v. Petren Res. Corp.*, 699 F. Supp. 161 (N.D. Ill. 1998), *aff'd*, 892 F. 2d 680 (7th Cir. 1990) .......... 23

*Bator v. Hawaii*, 39 F.3d 1021 (9th Cir. 1994) .......... 13

*Blaylock v. First Am. Title Ins. Co.*, 504 F. Supp. 2d 1091 (W.D. Wash. 2007) .......... 34

*Bridge v. Phoenix Bond & Indem. Co.*, __ U.S. __, 128 S. Ct. 2131 (2008) .......... 1, 20, 21, 23

*Brown v. Ticor Title Ins. Co.*, 982 F.2d 386 (9th Cir. 1992) .......... 33

*Cal. Serv. Station & Auto Repair Ass'n v. Am. Home Assur. Co.*, 62 Cal. App. 4th 1166 (1998) .......... 17

*Castello v. Allianz Life Ins. Co. of N. Am.*, No. 03-20405, slip op. (4th Dist. Ct. Minn. May 14, 2007) .......... *passim*

*Chern v. Bank of Am.*, 15 Cal. 3d 866 (1976) .......... 15, 16

*De Ment v. Abbott Capital Corp.*, 589 F. Supp. 1378 (N.D. Ill. 1984) .......... 30

*Delaney v. Am. Express Co.*, No. 06-5134 (JAP), 2007 WL 1420766 (D.N.J. May 11, 2007) .......... 18

**Page**

*Donaldson v. Read Magazine, Inc.*,
333 U.S. 178 (1948) ........ 15

*Engalla v. Permanente Med. Group, Inc.*,
15 Cal. 4th 951 (1997) ........ 18

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) ........ 18

*Fogel v. Farmers Group, Inc.*,
160 Cal. App. 4th 1403 (2008) ........ 33

*Forsyth v. Humana, Inc.*, 114
F.3d 1467 (9th Cir. 1997) ........ 20

*Frankford Trust Co. v. Advest, Inc.*,
943 F. Supp 531 (E.D. Pa. 1996) ........ 26, 29

*Frenzer v. Mut. Ben. Health & Accid. Ass'n*,
27 Cal. App. 2d 406 (1938) ........ 32

*Impress Commc'ns v. Unumprovident Corp.*,
335 F. Supp. 2d 1053 (C.D. Cal. 2003) ........ 26

*In re the Conservatorship of Everett Ernest Ow*,
No. GP011324, Hearing on Petition for Conservatorship,
Transcript (L.A. Super. Ct. Aug. 9, 2005) ........ 11

*In re Licenses & Licensing Rights of Allianz Ins. Co. of N. Am.*,
No. VA 1152-AP, Order to Show Cause/Accusation and
Notice of Hearing (Nov. 13, 2006) ........ 7

*In re Managed Care Litig.*,
150 F. Supp. 2d 1330 (S.D. Fla. 2001) ........ 33

*In re MDC Holding Sec. Litig.*,
754 F. Supp. 785 (S.D. Cal. 1990) ........ 15, 16

*In re Rubber Chems. Antitrust Litig.*,
232 F.R.D. 346 (N.D. Cal. 2005) ........ 28

*Iorio v. Allianz Life Ins. Co. of North Am.*,
No. 05 cv 633 JLS (CAB), slip op. (S.D. Cal. July 8, 2008) ........ *passim*

*Kemp v. AT&T*,
393 F.3d 1354 (11th Cir. 2004) ........ 16

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
232 F.3d 979 (9th Cir. 2000) ........ 33

**Page**

*Lias v. Safeco Ins. Co. of Am.*,
No. 2:06-cv-271-FtM-29DNF, 2007 U.S. Dist. LEXIS 26159
(M.D. Fla. Apr. 9, 2007) .......... 33

*Lustiger v. United States*,
386 F.2d 132 (9th Cir. 1967) .......... 14

*Maio v. Aetna, Inc.*,
221 F. 3d 472 (3d Cir. 2000) .......... 26, 27

*Mathews v. Kidder, Peabody & Co.*,
260 F.3d 239 (3d Cir. 2001) .......... 27

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) .......... 13

*McClain v. Coverdell & Co.*,
272 F. Supp. 2d 631 (E.D. Mich. 2003) .......... 27

*McCullough v. Suter*,
757 F.2d 142 (7th Cir. 1985) .......... 27

*Migliaccio v. Midland Nat'l Life Ins. Co.*,
No. 06-1007 CAS(MANx), 2007 WL 316823
(C.D. Cal. Jan. 30, 2007) .......... 16

*Nantahala Power & Light Co. v. Thornburg*,
476 U.S. 953 (1986) .......... 33

*Neder v. United States*,
527 U.S. 1 (1999) .......... 18

*Negrete v. Allianz Life Ins. Co. of N. Am.*,
238 F.R.D. 482 (C.D. Cal. 2006) .......... 14, 21

*Phillips v. Am. Int'l Group, Inc.*,
498 F. Supp. 2d 690 (S.D.N.Y. 2007) .......... 17, 18

*Poulos v. Caesar's World, Inc.*,
379 F.3d 654 (9th Cir. 2004) .......... 20

*Reichardt v. Life Ins. Co. of N. Am.*,
485 F. Supp. 56 (N.D. Cal. 1979) .......... 32

*Religious Tech. Ctr. v. Wollersheim*,
796 F.2d 1076 (9th Cir. 1986) .......... 30

**Page**

*S. Farm Bureau Life Ins. Co. v. Banko*, No. 8:06-CV-840-T-27EAJ, 2006 U.S. Dist. LEXIS 74510 (M.D. Fla. Oct. 10, 2006) .......... 33

*Saver v. Lincoln Nat'l Life Ins. Co.*, No. 7:05-CV-1423, 2006 U.S. Dist. LEXIS 96126 (N.D. Ala. Oct. 12, 2006), *aff'd sub nom.* 228 F. Appx 963 (11th Cir. 2007) .......... 17

*Semanko v. Minn. Mut. Life Ins. Co.*, 168 F. Supp. 2d 997 (D. Minn. 2000) .......... 24, 25

*Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978 (9th Cir. 2007) .......... 13

*Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990 (9th Cir. 1986) .......... 28

*T. W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626 (9th Cir. 1987) .......... 13

*Taffet v. Southern Co.*, 967 F.2d 1490 (11th Cir. 1992) .......... 33

*Tepper Realty Co. v. Mosaic Tile Co.*, 259 F. Supp. 688 (S.D.N.Y.1966) .......... 23, 24

*Terminate Control Corp. v. Horowitz*, 28 F.3d 1335 (2d Cir. 1994) .......... 29

*Uniforce Temp. Personnel, Inc. v. Nat'l Council on Comp. Ins., Inc.*, 892 F. Supp. 1503 (S.D. Fla. 1995), *aff'd* 87 F.3d 1296 (11th Cir. 1996) .......... 7, 27, 33

*United States v. Autuori*, 212 F.3d 105 (2d Cir. 2000) .......... 16, 17

*United States v. Boscarino*, 437 F.3d 634 (7th Cir. 2006) .......... 14

*United States v. Chavis*, 461 F.3d 1201 (10th Cir. 2006), *cert. denied*, 127 S. Ct. 2062 (2007) .......... 14

*United States v. Halbert*, 640 F.2d 1000 (9th Cir. 1981) .......... 14, 22

*United States v. LeDonne*, 21 F.3d 1418 (7th Cir. 1994) .......... 14

*United States v. Lowry*, 409 F. Supp. 2d 732 (W.D. Va. 2006) .......... 14

**Page**

*United States v. Munoz*, 233 F.3d 1117 (9th Cir. 2000) ........ 14

*Volckman v. Edwards*, 642 F. Supp. 109 (N.D. Cal. 1986) ........ 30

*Wah Chang v. Duke Energy Trading & Mktg. LLC*, 507 F.3d 1222 (9th Cir. 2007) ........ 33

*Walling v. Beverly Enters.*, 476 F.2d 393 (9th Cir. 1973) ........ 14

*Weiss v. First Unum Life Ins. Co.*, 482 F.3d 254 (3d. Cir. 2007) ........ 27

**STATUTES, RULES AND REGULATIONS**

California Insurance Code

§10168.93(b) ........ 31

Federal Rules of Civil Procedure

12(b)(6) ........ 18

56(c) ........ 12

18 U.S.C.

§1341 ........ 13

**SECONDARY AUTHORITIES**

Schwarzer, Tashima & Wagstaffe, *Cal. Prac. Guide: Federal Civil Procedure Before Trial* 14:123 (The Rutter Group 2007) ........ 13

SEC Press Release, "SEC Moves to Protect Seniors from Fraudulent and Abusive Practices in Sale of Equity Indexed Annuities" (June 26, 2008) ........ 34

Plaintiffs Carolyn Y. Healey and Vida F. Negrete, as Conservator for Everett E. Ow ("Plaintiffs"), respectfully submit this memorandum in opposition to Defendant Allianz Life Insurance Company of North America, Inc.'s ("Allianz" or "defendant") motion for partial summary judgment.

## I. INTRODUCTION

Allianz persuaded 78-year old Carolyn Healey and 82-year old Everett Ow, who is now represented by a court-appointed guardian, to pay $445,403.64 in premiums for a total of five annuities at issue in this action. While these annuities prevented Plaintiffs from gaining full, penalty-free access to their monies until they were 93 and 98-years old, respectively, their agents, Harry Smelser and Mark Lindsey, pocketed [redacted] in commissions from these sales. Allianz foisted these costly, illiquid and poorly performing annuities on Plaintiffs by misrepresenting and failing to disclose their essential features (such as the nature of so-called "bonuses" and its use of high, first-year teaser rates) and other associated high costs, including sales commissions. *See* Plaintiffs' Statement of Genuine Issues and Additional Material Facts in Opposition to Motion for Summary Judgment ("PSGI"), Nos. 227-54.

Allianz now moves for summary judgment on Plaintiffs' RICO claims, but not state-law claims, arguing that, as a matter of law, Plaintiffs did not rely on its sales materials and sustained no injury as a result of its fraudulent scheme. The Supreme Court's recent unanimous opinion, *Bridge v. Phoenix Bond & Indem. Co.*, __ U.S. __, 128 S. Ct. 2131 (2008), which disavowed any requirement that civil RICO claimants show they relied on defendants' statements, all but moots Allianz's motion.

In *Bridge*, the Court clarified that damages need only be a foreseeable consequence of defendants' misrepresentations. The "out-of-pocket" benefit of the bargain and other damages, calculated by their expert, Craig J. McCann, Ph.D., CFA, are entirely proper. *See* Declaration of Craig McCann filed in support of Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment ("McCann Decl."), ¶¶48-60. As discussed below and in the McCann Declaration, Plaintiffs suffered

demonstrable, non-speculative economic harm from Allianz's fraudulent conduct, and calculation of their damages are based on well-recognized economic principles.

Allianz cannot shift accountability for its fraudulent conduct to the California and Florida regulators. Neither the contracts nor the sales materials were "approved" by California, and neither state opined on the value of these annuities. Indeed, the California Department of Insurance brought an administrative action alleging Allianz misled seniors into purchasing its annuities. While that action resulted in a $10 million settlement, the Department's former General Counsel has made clear that policyholders must rely on private actions to get relief. Ex. 153.[1]

Nor can Allianz hide behind the "filed rate doctrine," as no regulatory authority – state or federal – approves any "rates" for its deferred annuities. Ironically, after Allianz filed the instant motion, the SEC proposed "a new rule that would protect seniors and other investors from fraudulent and abusive practices in the sale of equity indexed annuities." Ex. 157 (June 26, 2008 SEC Press Release). Under the SEC's proposed new rule, equity indexed annuities will eventually qualify as "securities" under federal law. *Id.* It is precisely because the sale and benefits of equity indexed annuities are largely ***un***regulated – and thus Allianz's "filed rate doctrine" and regulatory arguments are inapposite – that this new rule was proposed.

Allianz's motion consists of the same "vigorous factual argument[s]" rejected in *Iorio v. Allianz Life Ins. Co. of North Am.*, No. 05 cv 633 JLS (CAB), slip op. (S.D. Cal. July 8, 2008) (Ex. 158), and *Castello v. Allianz Life Ins. Co. of N. Am.*, No. 03-20405, slip op. (4th Dist. Ct. Minn. May 14, 2007) (Ex. 159). Significantly, the *Iorio* court found: (i) the misrepresentations were material and Allianz had a duty to disclose the omitted facts (slip op. at 22-25), (ii) triable issues of fact existed regarding

---

[1] References to "Ex. __" herein are to Exhibits attached to Declaration of John J. Stoia, Jr. in Support of Plaintiffs' Opposition to Defendant's Motion for Partial Summary Judgment ("Stoia Decl.").

reliance (though not required for Plaintiffs' RICO claims here) (*id*. at 16-19), and (iii) Plaintiffs "can seek damages" resulting from Allianz's "half truths" (*id*. at 25-26).

Based on the record of this case – a stronger factual record than presented in either *Iorio* or *Castello* – Plaintiffs' RICO claims cannot be resolved as a matter of law. Accordingly, Allianz's motion for partial summary judgment should be denied.

## II. STATEMENT OF FACTS

### A. The Allianz Deferred Annuity Products at Issue

#### 1. Allianz's Two-Tier Products at Issue (Bonus Maxxx and MasterDex 10)

A two-tier deferred annuity provides two alternative benefit streams, or tiers. It has a cash tier which can be accessed at any time and represents the policy's cash value, *i.e.*, it is subject to the prevailing surrender charge or, depending on the annuity, a front-end load of up to [redacted]. The second tier is an income tier which may become available only after the deferral period, and only by means of a payment schedule over a certain number of years. Each tier is credited a different rate annually, and the cash tier is lower than the income tier. Ex. 162.

##### a. Bonus Maxxx

The Bonus Maxxx annuity is a two-tier deferred annuity which Allianz represents as offering a 10% premium bonus in the income tier. This product has also been offered with 12% and 14% bonuses. It has a five-year deferral period and a 10-year annuitization payout period to receive the bonus. If a policyholder ever takes a lump-sum payment, or does not annuitize the policy for 10 years, they receive only the cash tier of 90% of premium plus interest credited at a reduced rate (typically 3%). The Bonus Maxxx pays a [redacted]. Ex. 71.

##### b. MasterDex 10

The MasterDex 10 is a two-tier equity-indexed annuity with a so-called 10% premium "bonus." The MasterDex 10 has a [redacted], so the cash tier for MasterDex 10 is equal to [redacted], accumulated at 1.5% annually. This

means that the policy must stay in-force for approximately nine years for the cash surrender value to surpass the initial gross premium on a guaranteed basis. The MasterDex 10 pays a [redacted]. This annuity requires an annual expense charge of approximately [redacted] ("bps") simply to cover the cost of commissions and administration expenses and to allow for an after-tax net profit to Allianz of [redacted]. PSGI No. 35 & Ex. 162 (ALC3049385).

**2. Allianz's Single-Tier Products at Issue (Power 7 and FlexDex Multichoice)**

**a. Power 7**

The Power 7 is a single-tier, single premium deferred annuity. It purports to pay a 7% premium bonus, and the interest rate is guaranteed for one year. It has a 10-year decreasing surrender charge schedule starting at 10% and grading to 0% during which a market value adjustment is applied on surrenders. The Power 7 pays a [redacted]. PSGI No. 25 & Ex. 8.

**b. FlexDex Multichoice**

The FlexDex Multichoice is a single-tier flexible premium equity-indexed deferred annuity. It purports to have a 10% equity-growth limit guarantee for the first year, after which the equity growth can be limited to 5% per year at the Company's discretion. The product has a surrender charge which is level at 15% for five years and then grades to 0% at the end of 12 years. The FlexDex pays a [redacted]. Ex. 70.

**B. The Marketing and Sale of Allianz's Deferred Annuities**

**1. Allianz's Scheme to Defraud Seniors**

Allianz markets and sells deferred annuities through a tightly controlled network of agents and Field Marketing Organizations ("FMOs"). PSGI Nos. 155-81, 204-08. Allianz enters into written agreements with each FMO and sales agent, providing authorization to sell its deferred annuities and the terms thereof. PSGI No. 160. Allianz describes these relationships as "partnerships," and [redacted]

[redacted]. PSGI No. 161.

The sales agents are required to use, and strictly adhere to, Allianz's standardized marketing and sales materials. PSGI Nos. 204-08. In fact, Allianz requires agents to provide all prospective purchasers with copies of consumer brochures and Statements of Understanding ("SOU"). *Id.* It also requires agents to "thoroughly review" the materials with the purchaser. *Id.* Prior to purchasing the annuity, the purchaser must review and sign, among other things, the SOU attesting: "I have read and understand the above information, it has been discussed with and explained to me by the agent . . . ." *Id.* All Allianz agents, including Ow's agent Mark Lindsey and Healey's agent Harry Smelser, counter-signed each SOU to confirm they had "presented and provided a copy of the [SOU] to the owner" and had "not made statements that differ from the disclosure form." PSGI Nos. 212, 220.

Through its agents and FMOs, Allianz targets seniors in the sale of deferred annuities. In its training materials, Allianz highlights the "stress and fear" of senior citizens and presents it as an "opportunity" for sales. PSGI Nos. 172, 174, 177. Allianz states in a number of brochures that seniors present a marketing opportunity because they are elderly, afraid and insecure. *Id.* As a result, [redacted].

Once the annuity is sold, Allianz systematically reduces crediting rates, thereby reducing policy benefits. [redacted]. Ex. 117; PSGI No. 244. [redacted]. Ex. 160; PSGI Nos. 243-44. [redacted]. Ex. 117; PSGI No. 244.

### 2. Allianz's Misrepresentations and Omissions

As discussed herein and Plaintiff's Separate Statement, Allianz's sales materials and SOUs misrepresented or failed to disclose essential features of its deferred annuities, including (i) the illusory "bonus," (ii) unrealizable yields, and (iii) expenses and charges, including, *inter alia*, sales commissions. *See* PSGI Nos. 226-35.

#### a. Allianz's Purported "Bonus" Is Illusory

Allianz represented it would pay plaintiffs an "up-front" or "immediate" bonus. PSGI No. 266. For instance, Allianz represented to Mrs. Healey that her "Accumulator Bonus Maxxx annuity offers you a big 10% bonus on all funds placed in the policy in the first year. And the bonus is immediate – we increase the value of your policy by a full 10% the very day your policy becomes effective." *Id.* Similarly, Allianz represented to Mr. Ow that his MasterDex 10 "give[s] an immediate gain with a 10% premium bonus." *Id.*

These representations were false in at least two respects. First, there is nothing "immediate" about the bonus, as plaintiffs must hold their annuities for at least ***fifteen years*** to receive it. PSGI No. 227. Second, even if a policyholder holds the annuity to maturity, she will never receive the full value of the "bonus," because Allianz "claws it back" by systematically lowering renewal crediting rates and caps[2] and applying hidden charges at annuitization. PSGI No. 228. Yet, as Allianz's senior executives and corporate designees testified, its recoupment plan was never disclosed. Its actuary Cummings testified that, for Power 7, [redacted]. Ex. 28; PSGI No. 228. Charles Field, corporate designee on sales policies, testified he was "not aware of any" SOU that disclosed this fact. PSGI No. 244. Allianz's internal e-mails confirm this testimony. *Id.* ([redacted]).

---

[2] "Cap" is a limitation used in determining the equity growth credited to policyholders.

In July 2005, the California DOI issued a report condemning as "misleading" Allianz's representation that bonuses are "immediate" and "up-front" and could be used to "overcome surrender charges" and "recover losses." Ex. 155 (California DOI, Public Report of Target Compliance Examination of Allianz, at 8 (July 31, 2005)). The DOI rejected Allianz's position – repeated here – that the 15-year holding period is adequately disclosed in consumer brochures. *Id*. at 8-9; *see* Ex. 158 (*Iorio*, slip op. at 18) ("the Court is particularly persuaded by the reasoning of the California Department of Insurance (DOI) in its public report of Allianz.").

Following its report, the California DOI initiated administrative proceedings against Allianz to curb its abusive business practices, including targeting seniors and using deceptive marketing materials that advertise "immediate" bonuses. *See* Ex. 78 (*In re Licenses & Licensing Rights of Allianz Ins. Co. of N. Am.*, No. VA 1152-AP, Order to Show Cause/Accusation and Notice of Hearing (Nov. 13, 2006)). Allianz recently settled with the DOI, agreeing to revise its written materials to "plainly and conspicuously disclose the terms of the premium bonuses it offers." Ex. 79 (*In the Matter of the Licenses and Licensing Rights of: Allianz Ins. Co. of No. Am.*, No. VA 1152-AP, OAH No. N2007020683, at 1 ("DOI Stip. & Waiver") (Dec. 28, 2007)).

**b. Teaser Yields**

Allianz also utilizes extraordinarily high first-year teaser yields to entice seniors to buy its annuities. Allianz Ex. 12 at 332[3]; Ex. 5 at ALC01675344-48; Ex. 40 at 515. These yields could not be maintained because Allianz had a policy of [redacted], thereby reducing benefits to policyholders. Ex. 118; PSGI No. 244. For example, in 2005, Allianz reduced policyholder benefits by [redacted]. Exs. 118, 126, 160; PSGI No. 244. Allianz also passed on the cost of bad investment performance to

---

[3] References herein to "Allianz Ex. __" are to defendant's Appendix.

policyholders – for instance, [redacted] (*id.*, PSGI No. 250) – [redacted]. Ex. 118; PSGI No. 250. Allianz failed to disclose this to purchasers.

The materiality of these omissions is demonstrated by the performance of Mrs. Healey's 2002 Bonus Maxxx annuity: she lost $4,913 of her retirement savings on the day she purchased her annuity. McCann Decl., ¶50.

Allianz's hidden-spread practices are particularly egregious when used in combination with "firesale" promotions – a marketing campaign to generate increased sales by offering higher premium bonuses on select products. For instance, Mr. Ow purchased Allianz's MasterDex 10 annuity during a firesale promotion that offered a 12% premium "bonus" instead of the normal 10% premium "bonus." Allianz, Ex. 11. [redacted]. PSGI No. 228.

**c. Allianz's Undisclosed Charges**

Allianz represented to Plaintiffs that its deferred annuities were no-load, no-cost, no-fee products. PSGI No. 232. Examples of these false statements found throughout the consumer brochures provided to Plaintiffs include:

- "No initial sales charges. There are never any asset fees or sales charges." Allianz Ex. 12, ALC0275646-57 at 53.
- "No fees to reduce your gains. No annual fees or yield spread charges will reduce your policy values . . . ." Allianz Ex. 5, ALC0167539-54 at 551.
- "Are there any initial sales charges? There are no initial sales charges." Allianz Ex. 5, ALC0167539-54 at 551.

Contrary to these representations, Allianz's internal documents show the annuities sold to Plaintiffs [redacted]. *See* ALC1100286 at 96 ([redacted]). [redacted]. Ex. 28; PSGI No. 233. This included, for example, high commissions, including $49,689 to Lindsey for selling three Allianz

annuities to Mr. Ow, and $3,300 to Smelser for selling the Bonus Maxxx to Mrs. Healey. PSGI Nos. 197, 223.

These costs gutted the annuities' performance. This is because Allianz recovers these costs by increasing the spread, thereby reducing policyholder benefits, and by imposing higher and longer surrender chargers. McCann Decl., ¶¶14, 32.

[redacted].

### C. Plaintiffs' Annuity Transactions

#### 1. Plaintiff Carolyn Healey

On February 4, 2002, at 78 years of age, Mrs. Healey paid $30,000 for an Allianz Bonus Maxxx.[4] PSGI No. 281. On September 23, 2004, two-and-a-half years later, Mrs. Healey surrendered her Bonus Maxxx for $29,188, nearly $1,000 less than her initial premium, and more than $6,650 less than the then-current account value. PSGI No. 221. The Bonus Maxxx required policyholders to hold the annuity for 15 years to receive the annuity's full, penalty-free value. PSGI No. 217.

Mrs. Healey signed an SOU in connection with her purchase, attesting she "read and understand[s] the above information, it has been discussed with and explained to me by the agent." PSGI Nos. 218-19. Pursuant to Allianz's policy, Smelser countersigned the SOU, certifying he had reviewed the marketing materials with Mrs. Healey and his sales presentation had not deviated therefrom. PSGI No. 220.

At the time she purchased the Bonus Maxxx annuity, Mrs. Healey was unaware of the many adverse features, costs and penalties associated with the product,

---

[4] Only Mrs. Healey's Bonus Maxxx purchased in 2002 is at issue. Although Mrs. Healey has not brought claims based on other annuities, Allianz attempts to conceal her loss from the 2002 Bonus Maxxx by offsetting the loss against purported gains on other annuities not at issue. No such offset can be applied here.

discussed above. Declaration of Carolyn Y. Healey in Support of Plaintiffs' Opposition to Allianz's Motion for Partial Summary Judgment ("Healey Decl."), ¶¶3-8. Had she known about and understood these features, Mrs. Healey would not have purchased the Allianz annuity. *Id.*, ¶8; *see also* Ex. 37 (Healey affidavit in Florida administrative proceedings against Smelser).

As a result of her purchase, Mrs. Healey has suffered $4,913 in out-of-pocket damages (McCann Decl., ¶50) and $4,478.64 in benefit-of-the-bargain damages. McCann Decl., ¶58.

**2. Plaintiff Ow**

In August 2002, Mr. Ow purchased two Allianz FlexDex Multi-Choice equity-indexed annuities for $89,463. PSGI Nos. 256, 263. On August 26, 2004, Mr. Ow purchased an Allianz MasterDex 10 annuity for $40,000. PSGI No. 220. Mr. Ow cannot access his entire investment, including earnings and bonus, without penalty, until he reaches age 95 – well beyond his life expectancy. PSGI No. 30.

At the time of Mr. Ow's purchase, [redacted] ("Asset Marketing") – [redacted]. PSGI No. 198. Asset Marketing's business is devoted entirely to the sale of deferred annuities to senior citizens. PSGI Nos. 167-81, 198. [redacted]. Exs. 94-97. [redacted]. PSGI Nos. 199-201. [redacted]. *Id.*

In conducting his sales presentation to Mr. Ow, Lindsey used Allianz's standardized sales materials, including the consumer brochure and SOU. When asked whether he provided these to Mr. Ow, Lindsey testified:

[redacted]

Ex. 9.

[redacted]. Ex. 9. Lindsey signed the SOUs for Mr. Ow's policies, confirming that he had provided a copy of the "presentation and provided a copy of the [SOU]" to Mr. Ow and had "not made statements that differ from the disclosure form." PSGI No. 212.

Mr. Ow also signed the SOU, attesting he had read Allianz's standardized sales materials concerning the FlexDex Multi-Choice and MasterDex 10 products. PSGI No. 202; Allianz, Ex. 13. However, at a hearing to the appoint his conservator, Mr. Ow testified:

> Q. Everett, why did you buy annuities from Mark Lindsey?
>
> A. Oh, well, I believe that was a mistake because I really didn't understand the annuities – what the limitations on the annuities were, and the length of time it would take to get repaid from them.
>
> Q. If you had understood them more clearly, would you have purchased them?
>
> A. No, I would not have.

Ex. 11, OW01555-56 (*In re the Conservatorship of Everett Ernest Ow*, No. GP011324, Hearing on Petition for Conservatorship, Transcript at 59:2-60:9 (L.A. Super. Ct. Aug. 9, 2005)); *see also* Ex. 10, OW01076-78 at 78 (stating: "I was afraid I had made a mistake in buying [the annuities]. When [my niece] found out that they can't be returned without big penalties, I felt very stupid and upset for having bought

them without knowing this . . . ."). On August 12, 2004, after Lindsey convinced Mr. Ow to surrender one of his Allianz annuities, Allianz asked Mr. Ow to confirm he wanted to do so. Ex. 24. Mr. Ow expressed his confusion, stating: "I wish I understood my annuities." *Id.* Allianz nevertheless processed the transaction and did nothing to ensure he understood the annuities. *Id.*; Allianz Fact No. 48.

In or about September 2005, shortly after Allianz sold the FlexDex Multi-Choice and MasterDex 10 annuities to Mr. Ow, a superior court appointed Dr. Vida Negrete to evaluate and look after Mr. Ow's financial well-being. Declaration of Dr. Vida Negrete in Support of Plaintiffs' Opposition to Allianz's Motion for Partial Summary Judgment ("Negrete Decl."), Ex. 20, ¶2. The court appointed her as conservator due to Mr. Ow's advanced age and diminishing mental capabilities. *Id.*, ¶4. According to Dr. Negrete, Mr. Ow showed "some [mental] impairment" at the time these proceedings were initiated. *Id.* Since then, Mr. Ow's short- and long-term memory has steadily deteriorated. *Id.*, ¶¶5-8.

At the time of purchase, Mr. Ow was unaware of many adverse features, costs and penalties associated with his annuities, such as Allianz's undisclosed intention to manipulate the credited interest rates or apply a "haircut" at annuitization. *See* Negrete Decl., ¶9; *see also* Ex. 11, OW01555-56; Ex. 10, OW01076-78 at 78. If he had known of the adverse features, he would not have purchased them. *Id.* Similarly, if Negrete had been the conservator of Mr. Ow at the time of the sales, she would not have purchased the deferred annuity products on his behalf. Negrete Decl., ¶9. As a result of his purchase of Allianz annuities, Mr. Ow has suffered $54,120 in out-of-pocket damages (McCann Decl., ¶50) and $29,785.23 in benefit-of-the-bargain damages. McCann Decl., ¶57.

## III. THE STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate only where "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Because summary judgment is such a drastic measure, Allianz, as the

moving party, bears the "heavy burden of demonstrating the absence of any triable issues of material fact" on the challenged claims. *See* Schwarzer, Tashima & Wagstaffe, *Cal. Prac. Guide: Federal Civil Procedure Before Trial* 14:123 (The Rutter Group 2007)[5]; *see also Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

Notably, the Court must draw all inferences in the light most favorable to Plaintiffs, as the non-moving party. *T. W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987). The Court "may not make credibility determinations or weigh conflicting evidence." *Bator v. Hawaii*, 39 F.3d 1021, 1026 (9th Cir. 1994). Rather, summary judgment is proper only when a rational trier of fact could not find for the nonmoving party on the claims. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## IV. PLAINTIFFS' EVIDENCE CREATES TRIABLE ISSUES OF FACT SUFFICIENT TO WITHSTAND ALLIANZ'S MOTION FOR SUMMARY JUDGMENT

### A. Allianz Violated the Mail and Wire Fraud Statutes in Multiple Ways

#### 1. Proof of a Specific Misrepresentation or Omission Is Not Necessary to Show that a Mail Fraud Violation Is the Proximate Cause of Plaintiffs' Injuries

Contrary to Allianz's assertion that "each plaintiff must prove that he received a material misrepresentation," Def's Mem. at 19, a plaintiff need not identify any specific misrepresentation, omission or "half-truth" to establish mail fraud. A party can commit mail fraud by (i) "having devised or intending to devise any scheme or artifice to defraud," ***or*** (ii) by "obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. §1341. The "activities

---

[5] Citations and internal quotation marks are omitted, and emphasis is added throughout, unless otherwise noted.

proscribed by either of these clauses ***constitute independent grounds***" for violations. *United States v. Halbert*, 640 F.2d 1000, 1007 (9th Cir. 1981).

Accordingly, "[t]he scheme to defraud itself" is sufficient to impose liability. *United States v. Boscarino*, 437 F.3d 634, 636 (7th Cir. 2006). As the Ninth Circuit has repeatedly explained, "[i]f a scheme is devised with the intent to defraud, and the mails are used in executing the scheme, ***the fact that there is no misrepresentation of a single existing fact*** is immaterial." *Lustiger v. United States*, 386 F.2d 132, 138 (9th Cir. 1967); *Halbert*, 640 F.2d at 1007 ("A defendant's activities can be a scheme or artifice to defraud whether or not any specific misrepresentations are involved."); *United States v. Munoz*, 233 F.3d 1117, 1131 (9th Cir. 2000); *see also United States v. LeDonne*, 21 F.3d 1418, 1426 (7th Cir. 1994) ("As long as the scheme was devised with the intent to defraud, how that intent manifests itself in execution is irrelevant.").

Plaintiffs proffer ample evidence that Allianz knowingly targeted senior citizens for purchasing its poorly-performing, illiquid and costly annuities. *See* PSGI Nos. 155-81; *Negrete v. Allianz Life Ins. Co. of N. Am.*, 238 F.R.D. 482, 488 (C.D. Cal. 2006) (recognizing "plaintiffs' claims are based on an alleged common course of conduct by Allianz to illegally target seniors for the purpose of selling them inferior deferred annuity products as part of a single overarching fraudulent scheme"). Accordingly, no misrepresentation need be proven. In any event, Allianz made many such misrepresentations concerning its deferred annuities.

### 2. Allianz Misrepresented and Concealed Material Adverse Facts About Its Deferred Annuities

Allianz concedes, as it must, that a false promise or "half truth" is sufficient to establish mail fraud. Def's Mem. at 18-24; *see United States v. Lowry*, 409 F. Supp. 2d 732, 737 (W.D. Va. 2006). "It has been the law under the mail fraud statute ever since a Supreme Court decision in 1896 . . . that to promise what one does not mean to perform, or to declare an opinion as to future events which one does not hold, is a fraud." *Walling v. Beverly Enters.*, 476 F.2d 393, 398 n.6 (9th Cir. 1973); *United*

*States v. Chavis*, 461 F.3d 1201, 1207-08 (10th Cir. 2006) (holding sufficient defendant's promise which he did not intend to fulfill), *cert. denied*, 127 S. Ct. 2062 (2007).

Through material misrepresentations, omissions, and "half truths," Allianz paints a grossly false picture of its deferred annuities. As discussed above, such misrepresentations include, among others, its illusory "bonus," high first-year teaser rates, and undisclosed charges, including sales commissions.[6] *See supra*, at 6-10; PSGI Nos. 226-28. These misrepresentations and omissions were contained in Allianz sales materials and SOUs, signed by Healey and Ow and the agents.[7] As the *Iorio* court found, Allianz (i) had a ***duty to disclose*** the true nature of its "bonus" and other alleged omissions, and (ii) such misrepresentations were clearly ***material***. Ex. 158 (*Iorio*, slip op. at 22-25). The same is true here.

---

[6] Allianz made a number of additional misrepresentations and omissions, all of which present questions of fact for the jury: (i) Plaintiffs would not be exposed to market risk; (ii) the annuities would keep pace with stock indexes; (iii) there was no risk of loss to Plaintiffs' principal and bonus; and (iv) Plaintiffs would receive "immediate" growth. *See* PSGI Nos. 227-253; McCann Decl., ¶¶24-43.

[7] Allianz relies on ***8***-point-font print buried at the bottom of the page to support its claim of adequate disclosure to 82-year-old Mr. Ow. Def's Mem. at 21 (reprinting in ***14***-point font). However, the Supreme Court has held mail and wire fraud statutes forbid persons from making broad promises in plain English and then relying on fine-print disclaimers to retract them. *See Donaldson v. Read Magazine, Inc.*, 333 U.S. 178, 188-89 (1948) ("Advertisements as a whole may be completely misleading although every sentence separately considered is literally true. . . . [if] advertisements are composed or purposefully printed in such way as to mislead."). Further, Allianz's post-sale contracts do not cure the fraud, both because they also fail to adequately disclose the features about which Plaintiffs complain (PSGI Nos. 40, 41, 79, 99, 100, 136, 147-50), and post-sale disclosures are no cure where the initial statement enticed the purchase, and certainly not as a matter of law. *In re MDC Holding Sec. Litig.*, 754 F. Supp. 785, 807 (S.D. Cal. 1990) (holding issue of whether later disclosures cured prior misrepresentations was question of fact for trial); *Chern v. Bank of Am.*, 15 Cal. 3d 866, 876 (1976) ("[T]he fact that defendant may ultimately disclose the actual rate of interest . . . does not excuse defendant's practice of quoting a lower rate in its initial dealings with potential customers."). Further, the "free-look" provision in the contracts does not help Allianz, as this generic notice that seniors have a right to return the policy within 30 days does not disclose the adverse features at issue. *See, e.g.*, Allianz Ex. 11 at 292.

**a. Allianz Had a Duty to Disclose**

Allianz contends, without authority, it had no duty to disclose these facts to policyholders. Def's Mem. at 22-26. However, having spoken regarding the so-called "bonus," applicable rates and costs of its annuities, Allianz had a duty to tell the whole truth. *United States v. Autuori*, 212 F.3d 105, 119 (2d Cir. 2000); *Kemp v. AT&T*, 393 F.3d 1354, 1360 (11th Cir. 2004); Ex. 158 (*Iorio*, slip op. at 24).

Further, this Court has already refused to find, as a matter of law, that insurers have no duty to disclose commissions and other compensation to sales agents. *See Migliaccio v. Midland Nat'l Life Ins. Co.*, No. 06-1007 CAS (MANx), 2007 WL 316823, at *6 (C.D. Cal. Jan. 30, 2007). Although Plaintiffs assumed their agents were compensated, neither Ow nor Healey knew the ***amount or extent*** of the commissions Allianz paid its agents.[8] PSGI Nos. 10, 68. When Mrs. Healey inquired about the commissions earned from her purchase of the Bonus Maxxx, Smelser dodged the question, saying "I'm being taken care of." PSGI No. 68. Little did she know Allianz would strip her annuity of over 10% of her investment to "take care of" Smelser. PSGI No. 68.

Likewise, the *Iorio* court found Allianz had a duty to disclose "the mechanisms by which it would undercut and recoup the amount of the bonus, such that the policyholder ended up collecting a return much less than [the amount of the bonus]." Ex. 158 (*Iorio*, slip op. at 25). Thus, contrary to Allianz's argument, it also was obligated to disclose the fact that certain charges applied if the policyholder annuitized prior to the tenth year, *i.e.*, the "haircut." Exs. 69-71. The undisclosed "haircut" of up

---

[8] Allianz also suggests Mr. Ow knew or should have known of Lindsey's compensation because the California DOI Buyer's Guide advises consumers agents may make commissions on sales. Def's Mem. at 22 n.10. Even assuming *arguendo* this could cure Allianz's failure to disclose, which it does not, the Buyer's Guide was not published until June 2006, two years ***after*** Mr. Ow's last annuity purchase. PSGI No. 147. In any event, it is insufficient as a matter of law, as post-sale "disclosures," particularly by a third party, cannot undo the fraud. *Cf. In re MDC Holding SEC Litig.*, 754 F. Supp. at 807; *Chern*, 15 Cal. 3d at 876.

to 10% of the value of the annuity imposed by Allianz (PSGI No. 231) rendered Allianz's representations that the annuities were free of fees and future sales charges, false and misleading. Ex. 158 (*Iorio*, slip op. at 24).

Allianz misapplies several decisions in an attempt to buttress its arguments, including *Cal. Serv. Station & Auto Repair Ass'n v. Am. Home Assur. Co.*, 62 Cal. App. 4th 1166, 1173 (1998); *Sayer v. Lincoln Nat'l Life Ins. Co.*, No. 7:05-CV-1423, 2006 U.S. Dist. LEXIS 96126 (N.D. Ala. Oct. 12, 2006), *aff'd sub nom.* 228 F. Appx 963 (11th Cir. 2007); and *Phillips v. Am. Int'l Group, Inc.*, 498 F. Supp. 2d 690 (S.D.N.Y. 2007). All are distinguishable. In *Cal. Serv. Station*, the court faced the narrow issue of whether an insurer was ***negligent*** for failing to disclose past dividend calculations on workers' compensation policies. 62 Cal. App. 4th at 1169. The court did ***not*** address whether an insurer had a duty to disclose under a theory of fraud, deceit, or misrepresentation, as these claims have "different elements [and] create entirely distinguishable obligations to disclose." *Id.* at 1173; *see* Ex. 158 (*Iorio*, slip op. at 24) (distinguishing *Cal. Serv. Station*). Further, the court recognized an insurer ***assumes a duty to disclose*** all relevant information by making statements about the feature at issue. 62 Cal. App. 4th at 1174; *see Autuori*, 212 F.3d at 119 ("A duty to disclose can also arise in a situation where a defendant makes partial or ambiguous statements that require further disclosure in order to avoid being misleading.").

In *Sayer*, an unpublished, non-binding decision applying Alabama state law, the trial court found that Lincoln National was not required to disclose its intention to recoup the bonus under Alabama, ***not*** federal wire fraud law. 2006 U.S. Dist. LEXIS 96126, at *18-*19. Accordingly, the *Iorio* court found *Sayer* of no value in considering the plaintiff's California fraud claim. Ex. 158 (*Iorio*, slip op. at 24). Also, in *Sayer*, there was ***no*** evidence of any misrepresentations because the alleged misrepresentations were oral, not written, and the plaintiff could not recall them. 2006 U.S. Dist. LEXIS 96126, at *28-*29 ("the court can not find any material

misrepresentations"). Here, by contrast, defendant's misrepresentations have been identified in its written sales materials and SOUs. PSGI Nos. 226-54.

The rulings of *Phillips*, 498 F. Supp. 2d 690 and *Delaney v. Am. Express Co.*, No. 06-5134 (JAP), 2007 WL 1420766 (D.N.J. May 11, 2007), are also distinguishable as they concerned Rule 12(b)(6) motions and alleged misrepresentations in the annuity contracts, as opposed to the sales materials. *See* Ex. 158 (*Iorio*, slip op. at 17) (distinguishing *Phillips* and *Delaney*). In addition, defendants in those cases disclosed, at the point of sale, that the interest rates may change in subsequent years. *See Phillips*, 479 F. Supp. 2d at 698; *Delaney*, 2007 WL 142076, at *5-*6. Here, Allianz failed to disclose, at the point of sale or otherwise, that the illusory "bonuses" would be (or even might be) recouped.

**b. Allianz's Misrepresentations and Omissions Are Material**

A fact is material "if it has a natural tendency to influence, or is capable of influencing" the intended victim. *Neder v. United States*, 527 U.S. 1, 16 (1999). Whether Allianz's alleged misrepresentations and omissions are "material" is a question of fact for the jury, not an issue to be decided by the Court as a matter of law. *See Fecht v. Price Co.*, 70 F.3d 1078, 1080-81 (9th Cir. 1995); *Engalla v. Permanente Med. Group, Inc.*, 15 Cal. 4th 951, 977 (1997). A jury could reasonably find any one of the alleged misrepresentations or omissions material.

For instance, the frequency, placement and emphasis accorded to representations regarding the "immediate" or "up-front" premium "bonus" preclude any finding but materiality. *See, e.g.*, PSGI No. 226; Allianz Ex. 5, ALC0167539-554 at 542. Such statements run throughout the sales materials and are prominently featured in large, italicized font at the top of the first page of the consumer brochure. PSGI No. 226; Allianz Ex. 40 at 513 ("***An immediate 10% bonus can be yours*** . . . ."). Allianz's promise to pay the bonus up-front is represented to agents as a chief selling point, and to consumers as the feature that makes this product unique. PSGI

No. 229. It is embedded in the very name of Mrs. Healey's annuity – 2002 Bonus Maxxx – and emphasized every time the name appears in the brochure and SOU. Ex. 40.[9]

Allianz's Chief Marketing Officer, Patrick Foley, conceded the haircut was material to a policyholder's decision to purchase a deferred annuity:

> [redacted]
>
> [redacted]

PSGI No. 235; Ex. 85 (Foley at 88). Further, Allianz's Senior Vice President of Product Development, Renee West, readily acknowledged that [redacted]. PSGI No. 235; Ex. 116 (West at 86:15-87:24). Accordingly, such an omission cannot be held immaterial as a matter of law. Ex. 158 (*Iorio*, slip op. at 23) ("the Court declines to find that the haircut was 'so obviously unimportant' that its disclosure would not have influenced a reasonable person").

The same is true with respect to the undisclosed costs, including sales commissions. Given the magnitude of these costs, and their impact on the performance of Plaintiffs' annuities, this information is critically important for any potential investor to make an informed decision regarding the purchase of the annuity. McCann Decl., ¶¶24, 31-43. In fact, had Plaintiffs been aware of these costs prior to purchasing their annuities, they would not have purchased them. PSGI Nos. 6, 71.

While Allianz insists its false statements about the crediting rates were immaterial because it paid the minimum guaranteed rate (Def's Mem. at 22), "a jury

---

[9] Beginning in 2006, after this litigation was commenced, Allianz revised its MasterDex series brochures to remove references to the premium bonuses being "immediate." In addition, Allianz discloses in the revised brochure that: "Bonus annuities may include annuitization requirements, lower caps, and other restrictions that are not included in similar annuities not offering a premium bonus." *See* Ex. 161. This recent disclosure supports Plaintiffs' claims that Allianz withheld material information regarding the deferred annuities Plaintiffs purchased.

could find that a reasonable person would consider 'material' Allianz's practices to manipulate how much the annuity exceeded the minimum." Ex. 158 (*Iorio*, slip op. at 23).

### B. Triable Issues of Fact Exist Regarding Whether Plaintiffs' Injuries Were Caused by Allianz's RICO Mail Fraud

A jury reasonably could find Plaintiffs were directly injured by Allianz's misrepresentations and omissions. Plaintiffs need not also establish that they relied on such "half truths," either as an independent element of their RICO claims or as a prerequisite to establishing Allianz's misconduct proximately caused them harm. Nevertheless, a jury could find they did so rely based on the evidence presented.

#### 1. Direct Injury, Not Reliance, Is Required

Since Allianz filed the instant motion, the Supreme Court unequivocally held "a plaintiff asserting a RICO claim predicated on mail fraud need not show, ***either as an element of its claim or as a prerequisite to establishing proximate causation***, that it relied on the defendant's alleged misrepresentations." *Bridge,* 128 S. Ct. at 2145. The Court explained, "[t]he statute provides a right of action to '[a]ny person' injured by the violation, suggesting a breadth of coverage not easily reconciled with an implicit requirement that the plaintiff show reliance in addition to injury in his business or property." *Id.* at 2139. The Court further explained, "[h]aving rejected petitioner's argument that reliance is an element of a civil RICO claim based on mail fraud, we see no reason to let that [reliance] argument in through the back door by holding that the proximate-cause analysis under RICO must precisely track the proximate-cause analysis of a common-law fraud claim." *Id.* at 2142.

Instead, there need only be "some direct relation between the injury asserted and the injurious conduct alleged."[10] *Id.* at 2145; *accord Anza v. Ideal Steel Supply*

---

[10] Neither *Poulos v. Caesar's World, Inc.*, 379 F.3d 654 (9th Cir. 2004), nor *Forsyth v. Humana, Inc.*,114 F.3d 1467 (9th Cir. 1997) – both decided before *Bridge* – support Allianz's argument. *Poulos* specifically declined to hold reliance was required to

*Corp.*, 547 U.S. 451, 461 (2006). Thus, the Court's focus is whether Plaintiffs' damages were a "foreseeable and natural consequence" of Allianz's scheme. *Bridge*, 128 S. Ct. at 2144; *see also Negrete,* 238 F.R.D. at 492 ("This evidence of standardized written presentations, coupled with plaintiffs' allegations that class members purchased annuity products far less valuable than other comparable products or the prices paid for them, adequately establishes proximate causation . . . .").

While *Bridge* makes clear plaintiffs need not prove they relied on the uniformly misleading sales materials, the Court suggested in some cases, third-party reliance may establish causation. 128 S. Ct. at 2144. Here, that "someone" includes Allianz's agents and the class generally.[11] *See* PSGI Nos. 204-07 (all sales agents must "thoroughly review" consumer brochures and SOUs with purchasers and make a written attestation that: "I have not made statements that differ from the disclosure form."). Mr. Ow's sales agent Lindsey testified that essentially all information about the annuity products came from Allianz; he "never" deviated from Allianz's uniform sales materials during his sales presentations, including to Mr. Ow; and he had neither reason to suspect nor know the information to be incorrect. Ex. 9. Absent the sales agents' and the Class members' reliance on Allianz's misrepresentations, the scheme would not have succeeded, and Plaintiffs' injuries would not have occurred. *See Bridge,* 128 S. Ct. at 2143.

Finally, although unnecessary, both Plaintiffs relied on Allianz's fraudulent sales materials, as demonstrated below. *See* discussion, *infra*, §IV.B.(3).

---

establish causation under RICO. 379 F.3d at 666 ("Because it is neither necessary nor prudent to reach the issue of whether reliance is the ***only way*** plaintiffs can establish causation in a civil RICO claim predicated on mail fraud, we decline to do so.") (emphasis in original). *Forsyth* never reached the causation issue due to the absence of any actionable misrepresentations and omissions. 114 F.3d at 1481-82.

[11] The SOUs provide direct, unrefuted evidence that the sales agents relied on Allianz's standardized written materials and that other class members relied generally on them as well. In any event, such evidence precludes Allianz from showing that ***no one*** relied on such materials, and certainly not as a matter of law.

### 2. Plaintiffs Present Ample Evidence of Direct Injury

Plaintiffs were directly injured by Allianz's fraudulent scheme, as well as by the material misrepresentations and omissions that Allianz made in furtherance of its scheme. Either injury-inducing event satisfies the causation requirement. *See Halbert*, 640 F.2d at 1007 (party commits mail fraud by devising a scheme to defraud or, alternatively, by obtaining money under false pretenses). Allianz's fraudulent scheme directly injured Plaintiffs because they were the intended victims of Allianz's scheme, were directly and aggressively targeted by Allianz's sales force, and consequently purchased Allianz's high cost, illiquid and inferior annuities.

The evidence also establishes a direct link between the financial harm Plaintiffs claim and the adverse features either hidden or misrepresented by Allianz. For example, both Plaintiffs were injured by the so-called "immediate" and "up front" bonuses. Mrs. Healey never received the bonus because she was forced to surrender before year 15. Mr. Ow's Power 7 annuity premium "bonus" was partially offset by the higher surrender charge imposed on bonus products. [redacted]. PSGI Nos. 228, 244.

Plaintiffs also will not realize the high first-year "teaser" yields designed to entice them to purchase the annuities. [redacted]. PSGI Nos. 226-28, 244.

In addition to injuries flowing from Allianz's failure to deliver the represented bonuses and yields, Plaintiffs were directly injured by its failure to disclose high costs including agent commissions ([redacted]), default charges ([redacted]), and an investment expense ([redacted]). PSGI No. 233. Allianz also failed to disclose that, in determining the crediting rate or cap, [redacted]

[redacted]. PSGI No. 244. To recoup the annuities' high costs and meet its profit target, Allianz imposed steep surrender charges. McCann Decl., ¶¶24, 32.

Here, as in *Bridge*, there are no "difficulties associated with attempting 'to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors.'" 128 S. Ct. at 2142 (quoting *Holmes*, 503 U.S. at 269); *see also Bastian v. Petren Res. Corp.,* 699 F. Supp. 161 (N.D. Ill. 1998) (finding proximate cause under RICO where plaintiff showed omissions led to decline in value of product), *aff'd*, 892 F. 2d 680 (7th Cir. 1990).

### 3. Reliance Is Not Required But Present

While not necessary to maintain their RICO mail fraud claim under controlling Supreme Court authority, both Plaintiffs presented evidence that they relied on the misrepresentations and omissions in Allianz's standardized written sales materials. This evidence creates material issues of fact that preclude summary judgment.

After Allianz filed its motion, agent Mark Lindsey testified: (i) [redacted], and (ii) [redacted]. PSGI Nos. 209-10. Mr. Lindsey testified Mr. Ow [redacted]. PSGI No. 209. Mr. Lindsey further testified that, [redacted].[12] *Id*. Mr. Lindsey also confirmed he [redacted]

---

[12] [redacted]. Ex. 132. ([redacted]). The percentage is even higher with respect to complaints arising out of sales by agents Lindsey and Smelser. *See* PSGI No. 255. Allianz should not be permitted to rely upon or disavow the signed SOUs depending upon whether or not it is favorable to Allianz. *Cf. Avila Group, Inc. v. Norma J. of Cal.*, 426 F. Supp. 537, 542 (S.D.N.Y. 1977) (holding a party cannot "claim the benefit of the contract and simultaneously avoid its burdens"); *Tepper Realty Co. v. Mosaic Tile Co.,* 259 F. Supp. 688, 692 (S.D.N.Y.1966) (holding a party "cannot rely on the contract, when it works to their advantage, and repudiate it when it works to their disadvantage").

[redacted]. *Id.* Finally, Mr. Ow testified that, if Allianz had provided full and accurate disclosures he would not have purchased the annuities. *See* Ex. 158 (*Iorio*, slip op. at 23) ("the Court must credit plaintiffs' declarations, wherein they uniformly state, under penalty of perjury, that they would not have purchased the annuities if they had known the information which Allianz failed to disclose").

Similarly, Mrs. Healey, along with agent Smelser, signed the SOU affirming she read and understood Allianz's written sales materials. PSGI Nos. 218-20. Further, Mrs. Healey has twice confirmed under oath (including in a declaration submitted herewith) that she purchased the Bonus Maxxx because of its safety, liquidity and performance, and had she known of the product's actual features, she would not have purchased it. *See* Healey Decl., ¶¶3-8; PSGI No. 65.

Even though Plaintiffs cannot specifically recall reading Allianz's marketing materials, a jury reasonably could attribute this to the Plaintiffs' advanced ages and/or the many years that have passed since they made their purchases. On similar facts, Judge Sammartino recently concluded in *Iorio* that, where "the deposition transcript contains contravening testimony regarding plaintiffs' inability to recall the process of reading and reviewing the marketing materials," the jury, not the Court, should resolve the conflicts; indeed "[a] reasonable jury could find that the available evidence satisfies [the] standard for actual reliance." Slip op. at 19.

*Semanko v. Minn. Mut. Life Ins. Co.*, 168 F. Supp. 2d 997 (D. Minn. 2000), relied on by Allianz, does not provide differently. Unlike here, the *Semanko* plaintiff's fraud claim was based on an ***oral*** sales presentation that he could not recall. The plaintiff's ***only*** evidence submitted to oppose summary judgment was his deposition testimony which lacked any specific facts about the misrepresentations and how they were made. *Id.* at 1000-01. By contrast, Plaintiffs have offered specific evidence, including documents, their own testimony and the testimony of other knowledgeable witnesses explaining what the misrepresentations were and how they

were made. Plaintiffs' evidence is sufficient to preclude summary judgment. *See* Ex. 158 (*Iorio*, slip op. at 16) (distinguishing *Semanko* based on documentary evidence).

### C. Triable Issues of Fact Exist Regarding Whether Plaintiffs Suffered Damages

Plaintiffs were damaged by Allianz's fraudulent scheme because they: (1) paid more for the annuities than they are worth, (2) could have benefited more by investing in alternative products with the same downside risk protections, and/or (3) paid premiums for products that were not as represented. These damages are objectively measurable by generally recognized, accepted economic and accounting methodologies, and not erased by gains earned on certain annuities.

#### 1. Plaintiffs Were Directly Damaged

Allianz argues because Plaintiffs' annuities have accumulated some value since they were purchased, Plaintiffs have profited and thus suffered no damages as a matter of law. *See* Def.'s Mem. at 31 ("Both plaintiffs enjoyed concrete financial gains on their Allianz annuities . . . .").[13] However, despite any gains, plaintiffs still experienced damages because the annuities did not perform as represented. The shortfall includes unrealized bonuses and yields, as well as default charges, investment expenses and high agent commissions. McCann Decl., ¶¶31-43, 48-60.

In rejecting this "no damages" argument in *Iorio*, Judge Sammartino found:

> [Plaintiffs] can seek damages arising from their reliance on Allianz's misrepresentation of a 10% immediate bonus and subsequent investment in Allianz's annuities. All three plaintiffs (including Mr. Iorio) fully or partially surrendered their annuities because of their dissatisfaction with the available rate of return. Therefore, these plaintiffs may be able to recover damages for Allianz's undisclosed manipulation of the yield,

---

[13] The paragraph from Dr. McCann's declaration in *Negrete v. Fidelity and Guaranty Life Ins.*, Case No. CV-05-6837-CAS (MANx), that Allianz cites in support of the proposition that the account value is properly used to determine the "worth" of an annuity on surrender is not part of the record in *F&G*, as Dr. McCann withdrew that paragraph from his declaration long before Allianz's motion was filed. *See* Notice of Withdrawal; PSGI Nos. 51-52. Further, when deposed, Dr. McCann testified that the ***cash surrender value***, not account value, is used to determine the value of a product upon surrender. Ex. 35 (McCann, Aug. 28, 2007, at 2-3).

> which effectively reduced that rate of return. Although Allianz claims that plaintiffs (whether Mr. Freifield or an unnamed class member) cannot suffer damages while continuing to hold onto some portion of their policy, the evidence viewed in the light most favorable to plaintiffs shows that those plaintiffs continue to suffer damages in the form of lower rates of return from Allianz's undisclosed reduction of yields.

Ex. 158 (slip op. at 26); *see also Frankford Trust Co. v. Advest, Inc.*, 943 F. Supp 531, 533-34 (E.D. Pa. 1996) (holding plaintiff was entitled to "lost profit" or "expectancy" damages under RICO despite increased value of the investment).

Thus, this case is not like the *Maio* or *Impress Communications* cases upon which Allianz relies. The *Maio* plaintiffs alleged their RICO injury consisted of the difference in value between the "high quality" health insurance promised and the "inferior" health insurance actually received. *Maio v. Aetna, Inc.*, 221 F. 3d 472, 486 (3d Cir. 2000). The *Impress Communications* plaintiffs alleged they were defrauded into buying substandard disability insurance policies. Significantly, and unlike here, neither the *Maio* nor the *Impress Communications* plaintiffs sustained any identifiable injury because they had made no claims under the allegedly substandard policies and thus received no benefits thereunder. PSGI Nos. 226-53; *compare* McCann Decl., ¶¶48-60. Not surprisingly, the courts concluded that the ***mere chance*** that the policies might not perform as represented is a speculative, unrecoverable injury. *See Maio*, 221 F.3d at 494; *Impress Commc'ns v. Unumprovident Corp.*, 335 F. Supp. 2d 1053, 1064 (C.D. Cal. 2003) (holding that because plaintiffs never claimed benefits, "their loss is tied to a speculative denial of benefits, and thus they have not suffered any injury under RICO").

Here, by contrast, the Allianz annuities underperformed from ***day one***. Promised "bonuses" and teaser rates were not credited on the date of purchase or thereafter, given Allianz's well-concealed practices designed to recoup its expenses and meet its profit target. PSGI Nos. 228, 244. Moreover, the hidden commissions, default and investment costs, and expenses applied on day one further depressed

Plaintiffs' rates of return.[14] Thus, unlike in *Maio* or *Impress Communications*, Plaintiffs have sustained actual damages. *See, e.g., McClain v. Coverdell & Co.*, 272 F. Supp. 2d 631, 637 (E.D. Mich. 2003) (distinguishing *Maio*); *In re Am. Investors Life Ins. Co. Annuity Mktg & Sales Practs. Litig.*, MDL No. 1712, 2007 WL 2541216, at *26 (E.D. Pa. Aug. 29, 2007) (distinguishing *Maio* to hold that plaintiffs who bought annuities with undisclosed deferral periods and surrender charges alleged RICO damages); *see generally Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 246-47 (3d Cir. 2001) (finding that plaintiffs sustained injury by purchasing a security for which the seller overstated expected returns and downplayed inherent risks).

As demonstrated below, Plaintiffs' damages are objectively measurable by three independent, generally accepted economic and accounting methodologies.

### 2. Plaintiffs' Damages Are Measurable

#### a. Plaintiffs Incurred Out-of-Pocket Damages

Out-of-pocket damages is a valuation methodology routinely accepted for RICO actions. *See*, *e.g.*, *Weiss v. First Unum Life Ins. Co.*, 482 F.3d 254, 258 n.2 (3d. Cir. 2007) (finding insured suffered out-of-pocket damages after selling his house at below-market rate as a result of insurer's RICO scheme to discontinue disability insurance payments); *McCullough v. Suter*, 757 F.2d 142, 143 (7th Cir. 1985) (affirming RICO damage award for the difference between the $23,000 plaintiff entrusted to defendant to invest in coins and the $10,000 value of coins plaintiff actually received); *see generally* Jed S. Rakoff & Howard W. Goldstein, *RICO Civil and Criminal Law*, §4.02[2][a] at 4-6 (2003) ("Rakoff, *RICO*") ("A standard measure of out-of-pocket loss is monies paid out minus any value received.").

---

[14] Allianz recaptured the undisclosed costs and realized its target profit goals through its manipulation of the credited rates, caps and other spread management practices to the Plaintiffs' detriment. This is not subject to speculation, conjecture or contingencies. The undisputed facts demonstrate that Allianz [redacted]. PSGI No. 244.

Here, Plaintiffs' out-of-pocket damages are the difference between the amounts paid for their annuities and the annuities' actual values at time of purchase. McCann Decl., ¶¶14, 48-51. Plaintiffs' expert Dr. McCann employed a three-step process to calculate damages: (1) he determined the projected accumulation value of each annuity on the applicable maturity date; (2) he then determined the present value of the annuities on the purchase date by applying a discount rate that reflects the risk Allianz will not actually pay the projected accumulation value; and (3) finally, he calculated the difference between the present value of the annuities and the amounts paid for them. *Id.*, ¶¶48-51. Dr. McCann determined that Mr. Ow suffered $54,120 in out-of-pocket damages from his four Allianz annuity purchases. *Id.*, ¶50. Ms. Healey incurred $4,913 in out-of-pocket damages from her Bonus Maxxx annuity. *Id.*, ¶51.[15]

### b. Plaintiffs Incurred Benefit-of-the-Bargain Damages

Alternatively, Plaintiffs' damages may be measured by a benefit-of-the-bargain damages methodology. Benefit-of-the-bargain damages measure the loss in value and are recognized as appropriate in numerous contexts. *See, e.g.*, *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 354 (N.D. Cal. 2005) (certifying antitrust claims); *cf. Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 1003 (9th Cir. 1986) (holding comparability of benchmark is question of fact).

Dr. McCann calculated Plaintiffs' damages by subtracting: (i) the value realized by Plaintiffs on the annuities they surrendered and the value they will realize on their remaining annuities if liquidated on the day of trial; from (ii) the value Plaintiffs would have received from an alternative benchmark investment (comprised of a mix of stocks and bonds) that shares the same risk attributes, including the same downside

---

[15] As Dr. McCann points out, these damage calculations are based on a conservative assumption of the AA-rated yield to discount the annuity payoffs. McCann Decl., ¶48, n.13. At trial Dr. McCann may very well use a higher discount rate which would lower the annuity valuations (*i.e.*, increase these damage calculations). *Id.*

risk protection, as the Allianz annuities purchased. McCann Decl., ¶52. Dr. McCann determined that Mr. Ow and Mrs. Healey suffered $29,785.23 and $4,478.64, respectively, in benefit-of-the-bargain damages. *Id.*, ¶¶58, 59.

Dr. McCann's investment benchmark analysis tracks that approved in another RICO action before the Eleventh Circuit. In *Maiz v. Virani*, plaintiffs alleged the defendants lured them into investing in a real estate venture, only to defraud them later by taking hidden profits on land sales. 253 F.3d 641, 650-52 (11th Cir. 2001). The defendants appealed the trial court's admission of testimony from plaintiffs' damage expert that the performance of an alternative investment (in that case, a real estate investment trust or "REIT") was an appropriate yardstick for measuring the profits plaintiffs would have earned if the pilfered funds had been invested according to their expectations. *Id*. at 664. Defendants there, like Allianz here, argued there was no evidence that plaintiffs would have in fact invested in the REIT (here, that Plaintiffs would have invested in the benchmark mix of stocks and bonds) and it was too risky and unpredictable to be used as a comparable investment benchmark. *Id*. at 664-65. The Eleventh Circuit rejected this argument.[16] *Id.*

**3. Plaintiffs Are Entitled to Restitution**

As an alternative measure of damages, Plaintiffs seek restitutionary relief consisting of the premiums they paid, plus interest, less the value of any interim benefits received. Restitution is a permissible remedy where, as here, Plaintiffs seek a refund of the monies paid and do not seek to "unravel" a complex set of transactions or "dismantle" Allianz's business through dissolution, divestiture or the like – the

---

[16] *See Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1343 (2d Cir. 1994) (affirming RICO damages where plaintiff lost contracts it might have obtained but for the conspiracy); *B&M Nat'l Automation, L.L.C. v. AMX Corp.*, No. 06-20412 CIV, 2007 WL 809675, at *3 (S.D. Fla. Mar. 15, 2007) (holding plaintiff's alleged loss of sales and profit as a result of a RICO violation were recoverable) (citing *Maiz*, 253 F.3d at 662-63); *Frankford Trust*, 943 F. Supp. at 533-34 (holding plaintiff trust could recover reasonable return it would have received on its investment but for defendant's misconduct); Rakoff, *RICO*, §4.02[5] (and cases cited therein).

traditional coercive forms of injunctive or equitable relief that have been the source of concern under RICO. *De Ment v. Abbott Capital Corp.*, 589 F. Supp. 1378 (N.D. Ill. 1984); *Volckman v. Edwards*, 642 F. Supp. 109 (N.D. Cal. 1986); *Ameriquest Mortgage Co. v. Couch*, No. 99-5353, 2000 WL 708404, at *1 (E.D. Pa. May 19, 2000). As explained by Judge Rakoff of the Southern District of New York:

> Restitution and rescission – putting the parties back where they were before the fraud - have been endorsed by the courts as appropriate RICO remedies, where the transactions at issue are fairly simple and plaintiff seeks the return of monies paid . . . . It is true that courts have generally indicated that injunctive and other equitable relief not in the nature of damages is not available under RICO. However, this does not apply to remedies that, although historically of an equitable nature result in monetary damages.

Rakoff, *RICO* §4.02[3], at 4-7 through 4-8; *see also Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1089 (9th Cir. 1986). Here, the appropriate amount of restitution can easily be determined from Allianz's own business records. McCann Decl., ¶60.[17] Thus, restitution is another method of relief available to Plaintiffs here.

**D. Allianz's Filing of Annuity Contracts with the DOIs Does Not Eliminate Triable Issues of Fact as to Whether Plaintiffs Suffered Damages**

Neither the California Department of Insurance ("California DOI") nor the Florida Office of Insurance Regulation ("Florida OIR") have placed their imprimatur on the "true value" of Allianz's deferred annuities, thereby precluding Plaintiffs' claim of damages. Def's Mem. at 28. Consequently, at least two other courts have rejected such arguments from Allianz. Ex. 158 (*Iorio*, slip op. at 8-10); Ex. 159 (*Castello*, slip op. at 8-10). This Court should too.

---

[17] Dr. McCann does not quantify the restitutionary amounts due Plaintiffs under this form of relief because it is calculated as of the date of judgment. For purposes of this motion, the point is that Plaintiffs have been damaged, and the precise amount necessary to restore them to the *status quo ante* can be calculated.

### 1. The Represented Value of Allianz's Annuities Do Not Carry the DOIs' Imprimatur

Allianz's "imprimatur" argument fails at a threshold level because its contracts are "filed with the [California DOI] ***for reference purposes only***. The Department . . . has no statutory authority to approve or disapprove such filings." Ex. 75 (Cal. Ins. Bulletin No. 82-5, at 2 (Oct. 4, 1982)). Ironically, Allianz relied on this language in rebuffing a DOI inquiry: "All life insurance and annuity filings submitted to the Department by [Allianz/]LifeUSA should be viewed as no-action filings. These filings are submitted to the Department only for informational purposes." Ex. 146; PSGI Nos. 285-86 & Ex. 76.[18] Indeed, the very statutory provision upon which Allianz relies provides: "Nothing contained in this section shall be construed as requiring or providing for the prior approval by the commissioner of forms of individual annuity contracts . . . ." Cal. Ins. Code §10168.93(b) (cited in Def's Mem at 17). Thus, the California filings proffered by Allianz reflect the forms as "filed," not approved. Allianz Exs. 106, 109-110.

In any event, Allianz's SOUs and consumer brochures for the products at issue, upon which Plaintiffs' claims are based, were ***not*** approved by the DOIs. PSGI Nos. 285-88. Allianz has taken the position, and the Florida OIR agreed, it has [redacted] to any SOU submitted with Allianz's form filings. Ex. 77. Further, far from approving its sales practices, the ***California DOI brought an Order to Show Cause against Allianz*** for using deceptive marketing materials that advertised "immediate" bonuses and engaging in improper sales tactics to induce seniors to buy confusing annuities. *See* Ex. 79 (DOI Stip. & Waiver, at 1).

---

[18] Contrary to Allianz's suggestion, the buyers' guides on which Allianz relies expressly disavow its products. Florida's Guide states "it does not constitute an endorsement for any service, company or person offering any product." Allianz Ex. 96 at 749. Similarly, California's Guide notes that "the CDI does not recommend or disapprove of these products." Allianz Ex. 111 at 850. Any general information provided by the DOIs concerning annuities cannot insulate Allianz from liability.

In the $10 million settlement that followed, the DOI specifically reserved the right of seniors to bring ***private lawsuits*** against Allianz concerning its deferred annuities or participate in ongoing class action litigation, including this action. *Id.* at 9. In a sworn affidavit, California DOI attorney, Jerry Whitfield stated:

> While the Department is the state agency vested with the authority to regulate the business of insurance in California, the Department is not vested with exclusive power to enforce the Insurance Code. The Department has consistently taken the position that purchasers of annuities are free to seek redress in a court of law for claims arising from deceptive sales practices. ***An insured's private action does not infringe the Department's jurisdiction to regulate the insurance industry***.

Ex. 154 at 2. Gary M. Cohen, former General Counsel of the DOI, similarly stated that the DOI "welcomes and supports the private enforcement of these and other proceedings being prosecuted as class actions . . . . ***Without these cases, many abusive practices would not be remedied due to limitations on the resources and jurisdiction of state regulatory authorities***." Ex. 153 at 1 (Cohen Decl.).

Thus, the DOIs have not insulated Allianz from liability with respect to the "value" of its annuities, and even if they had, it does not deprive this Court of its authority to adjudicate Plaintiffs' claims. *See Reichardt v. Life Ins. Co. of N. Am.*, 485 F. Supp. 56, 64 (N.D. Cal. 1979) ("The Commissioner's approval of a policy form in the abstract does not preclude a California court . . . from finding that such policy violates the law."); *Addison v. Am. Med. Secur.*, No. CL 00-01445 AB (Fla. Cir. Ct. 2002) (courts may review OIR findings for statutory violations); *see also Frenzer v. Mut. Ben. Health & Accid. Ass'n*, 27 Cal. App. 2d 406, 414 (1938) (filing of policy with DOI does not preclude determination it was misleading).

**2. The Filed Rate Doctrine Is Inapplicable**

Allianz takes its regulatory approval argument even farther afield by suggesting that its filing of ***form annuity contracts*** with the state DOIs somehow invokes the federal "filed rate doctrine." As the *Iorio* and *Castello* courts found in rejecting this same argument on summary judgment, this limited, disfavored doctrine does not apply here. Ex. 158 (*Iorio*, slip op. at 8); Ex. 159 (*Castello*, slip op. at 9-10).

The filed rate doctrine does not apply under Ninth Circuit law because the regulatory scheme applicable to deferred annuities does not provide for "meaningful state review" of uniform ***rates***.[19] *Brown v. Ticor Title Ins. Co.*, 982 F.2d 386, 394 (9th Cir. 1992). Neither does it apply under Eleventh Circuit law because there is no "flat rate set by a regulatory regime," nor "opportunity for public notice and comment prior to the acceptance of the rates." *In re Managed Care Litig.*, 150 F. Supp. 2d 1330, 1344 (S.D. Fla. 2001) (refusing to apply doctrine to RICO claims based on misrepresentations of health insurance policies) (citing *Taffet v. Southern Co.*, 967 F.2d 1490 (11th Cir. 1992)). Further, it does not apply in California because the "rates filed with the [state agency] were not subject to federal review." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 993 (9th Cir. 2000); *see, e.g., Fogel v. Farmers Group, Inc.*, 160 Cal. App. 4th 1403, 1418 (2008) (declining to apply doctrine to insurance rates); *see also Wah Chang v. Duke Energy Trading & Mktg, LLC*, 507 F.3d 1222, 1225 (9th Cir. 2007) (describing doctrine as applying to "rates charged by railroads, natural gas companies, [utilities,] and other interstate operators over whom ***federal agencies*** have exclusive power to set rates").

As demonstrated above, the "rates" – or rather, yields – for Allianz's equity-indexed deferred annuities are not scrutinized by the state DOIs.[20] *See Brown*, 982

---

[19] Allianz quotes a statement out of context to argue the doctrine is not limited to rates "per se." Def's Mem. at 28. However "[t]here is . . . no 'filed form doctrine' under Florida law." *S. Farm Bureau Life Ins. Co. v. Banko*, No. 8:06-CV-840-T-27EAJ, 2006 U.S. Dist. LEXIS 74510, at *4 (M.D. Fla. Oct. 10, 2006). Indeed, all the cases cited by Allianz dealt with claims directly related to highly-regulated federal rate schemes for utilities and common carriers. *See Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 967 (1986) (finding "FERC's decision directly affects Nantahala's wholesale rates by determining the amount of low-cost power that it may obtain"); *AT&T v. Cent. Office Tel., Inc.*, 524 U.S. 214, 233 (1998) (applying doctrine to Communications Act's scheme for tariff rates charged by common carriers).

[20] Allianz's citation to *Uniforce Temp. Personnel, Inc. v. Nat'l Council on Comp. Ins., Inc.*, 892 F. Supp. 1503 (S.D. Fla. 1995), *aff'd* 87 F.3d 1296 (11th Cir. 1996), is unavailing. Def's Mem. at 29. In *Uniforce*, plaintiffs "directly attack[ed] the actions of state regulatory authorities" in approving highly-regulated workers' compensation insurance, including assigned risk plans. 892 F. Supp. at 1512. Similarly, *Lias v. Safeco*

F.2d at 394 (refusing to apply doctrine to title insurance where state regulations only required "non-disapproval" of rates); *Blaylock v. First Am. Title Ins. Co.*, 504 F. Supp. 2d 1091, 1102 (W.D. Wash. 2007) (refusing to apply doctrine where title insurance was exempted from the comprehensive scheme regulating insurance rates). And, as is clear by the SEC's proposed rule that would regulate equity-indexed annuities, just as it does other securities, these annuities are not yet regulated by any federal agency in any meaningful way.[21] *See* Ex. 159 (*Castello*, slip op. at 3); Ex. 158 (*Iorio*, slip op. at 8-10) (same). Thus, the filed rate doctrine has no applicability here.

## V. CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully submit that Allianz's motion for partial summary judgment should be denied in its entirety.

DATED: July 25, 2008

Respectfully submitted,

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
JOHN J. STOIA, JR.
THEODORE J. PINTAR
RACHEL L. JENSEN
STEVEN M. JODLOWSKI

/s/ John J. Stoia, Jr.
JOHN J. STOIA, JR.

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

---

*Ins. Co. of Am.*, No. 2:06-cv-271-FtM-29DNF, 2007 U.S. Dist. LEXIS 26159 (M.D. Fla. Apr. 9, 2007), involved highly-regulated rates charged for automobile insurance. Unlike *Uniforce* and *Lias*, Plaintiffs' claims concerning Allianz's scheme to defraud seniors will not interfere with any rate-setting determinations by the Florida OIR. PSGI Nos. 287-288.

[21] *See* Ex. 157 (SEC Press Release, "SEC Moves to Protect Seniors from Fraudulent and Abusive Practices in Sale of Equity Indexed Annuities" (June 26, 2008)); Ex. 156 (17 C.F.R. Parts 230 and 240). These regulations, when approved, will not apply retroactively to any annuities at issue here. *Id.*

BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
ANDREW S. FRIEDMAN
KIMBERLY C. PAGE
MICHAEL C. McKAY
2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012
Telephone: 602/274-1100
602/274-1199 (fax)

BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
MANFRED MUECKE
501 W. Broadway, Suite 1450B
San Diego, CA 92101
Telephone: 619/756-7748

Co-Lead Class Counsel

S:\CasesSD\Allianz Annuity\BRF 00052923 Redacted.doc

CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 25, 2008.

s/ John J. Stoia, Jr.
JOHN J. STOIA, JR.

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: johns@csgrr.com

# Mailing Information for a Case 2:05-cv-06838-CAS-MAN

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **David A Applebaum**
  david.applebaum@leonard.com
- **Christopher G Barnes**
  cgb@jordenusa.com,ksm@jordenusa.com
- **Stephen R Basser**
  sbasser@barrack.com
- **Jason Beckerman**
  jbeckerman@eisnerlaw.com
- **Arthur G Boylan**
  arthur.boylan@leonard.com
- **Frank G Burt**
  fgb@jordenusa.com
- **Joel A Cohen**
  jcohen@sbd-law.com
- **Michael L Cohen**
  michaellcohen@cohen-law.org
- **Christa L Collins**
  ccollins@jameshoyer.com,dstephens@jameshoyer.com
- **Raul A Cuervo**
  rac@jordenusa.com,vhv@jordenusa.com
- **Ingrid M Evans**
  ievans@publiclawgroup.com,rredmayne@publiclawgroup.com
- **Denise A Fee**
  daf@jordenusa.com
- **Lawrence J Field**
  lawrence.field@leonard.com
- **Paul A Fischer**
  paf@jordenusa.com,dlb@jordenusa.com

- **Andrew S Friedman**
  afriedman@bffb.com,rcreech@bffb.com,ngerminaro@bffb.com
- **Wilson F Green**
  wgreen@bfgwc.com
- **Evangeline F Grossman**
  slacey@sbd-law.com
- **John L Haeussler**
  jhaeussler@barrack.com
- **Robert J Herrington**
  rherring@skadden.com
- **Rachel L Jensen**
  rjensen@csgrr.com
- **Steven M Jodlowski**
  sjodlowski@lerachlaw.com
- **James F Jorden**
  jfj@jordenusa.com,lw@jordenusa.com
- **Stephen J Jorden**
  sj@jordenusa.com,sxg@jordenusa.com
- **Anthony P Lalla**
  apl@jordenusa.com
- **Marisa C Livesay**
  livesay@whafh.com
- **Michael C McKay**
  mmckay@bffb.com
- **J Andrew Meyer**
  ccollins@jameshoyer.com,dstephens@jameshoyer.com
- **Marcus R Mumford**
  mmumford@skadden.com
- **Thomas J Nolan**
  tnolan@skadden.com,carl.roth@skadden.com,marcus.mumford@skadden.com
- **Linda B Oliver**
  loliver@reedsmith.com,swurth@reedsmith.com
- **Kimberly C Page**
  kpage@bffb.com

- **Theodore J Pintar**
  tedp@csgrr.com,e_file_sd@csgrr.com

- **Elizabeth Wiet Reutter**
  elizabeth.reutter@leonard.com

- **Elaine A Ryan**
  eryan@bffb.com

- **Eric C Schaffer**
  ecschaffer@reedsmith.com

- **William M Shernoff**
  wshernoff@sbd-law.com

- **John J Stoia , Jr**
  johns@csgrr.com,e_file_sd@csgrr.com

- **Patricia N Syverson**
  psyverson@bffb.com

- **Michael D Thamer**
  mthamer@trinityinstitute.com

- **Phong L Tran**
  ptran@csgrr.com

- **Jeffrey L Williams**
  jlw@jordenusa.com,ksm@jordenusa.com

- **C Todd Willis**
  ctw@jordenusa.com,jal@jordenusa.com

- **John A Yanchunis**
  jyanchunis@jameshoyer.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Krista D Barrie**
Leonard Street and Deinard
150 South 5th Street, Suite 2300
Minneapolis, MN 55402

**Howard D Finkelstein**
Finkelstein & Krinsk
501 West Broadway
Suite 1250

San Diego, CA 92101-3593

**Kurtis J Kearl**
Reed Smith
1999 Harrison Street, Suite 2400
Oakland, CA 94612

**Mark L Knutson**
Finkelstein & Krinsk
501 West Broadway
Suite 1250
San Diego, CA 92101-3593

**Louise H Renne**
Renee Sloan Holtman & Sakai
350 Sansome Street Suite 300
San Francisco, CA 94104-1304