1

2

3

4                                                                                        O

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10                        WESTERN DIVISION

11

12   VIDA F. NEGRETE, as Conservator for    )   Case Nos. CV 05-6838 CAS (MANx)
     EVERETT E. OW, an individual and on     )             CV 05-8908 CAS (MANx)
13   behalf of all other similarly situated  )
     persons,                                )
14                                           )   **ORDER DENYING DEFENDANT'S**
                    Plaintiff,               )   **MOTION TO DECERTIFY THE**
15                                           )   **CLASS**
     vs.                                     )
16                                           )
                                             )
17   ALLIANZ LIFE INSURANCE                  )
     COMPANY OF NORTH AMERICA,               )
18                                           )
                                             )
19                  Defendant.               )
     _____        )
20                                           )
     CAROLYN B. HEALEY, an individual,       )
21   and on behalf of all other similarly    )
     situated persons,                       )
22                                           )
                    Plaintiff,               )
23                                           )
     vs.                                     )
24                                           )
     ALLIANZ LIFE INSURANCE                  )
25   COMPANY OF NORTH AMERICA,               )
                                             )
26                                           )
                    Defendant.               )
27   _____        )

28



## I.     INTRODUCTION

In these related class action cases, plaintiffs Vida F. Negrete ("Negrete"), as conservator for Everett Ow ("Ow"), and Carolyn B. Healey ("Healey") (collectively, "plaintiffs"), on behalf of themselves and a nationwide class of an estimated 200,000 senior citizens, allege that defendant Allianz Life Insurance Company of North America, Inc. ("Allianz") conspired with a network of affiliated Field Marketing Organizations ("FMOs") to induce class members to purchase deferred annuities issued by Allianz by means of misleading statements and omissions regarding the value of those annuities.

Negrete filed suit against Allianz on September 19, 2005, alleging the following claims for relief: (1) violation of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961, et seq. ("RICO"); (2) elder abuse under Cal. Welf. & Inst. Code §§ 15610 et seq. ("§ 15610"); (3) unlawful, unfair and fraudulent business practices under California's Unfair Competition Law ("the UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq.; (4) false and misleading advertising under Cal. Bus. & Prof. Code §§ 17500, et seq. (the "False Advertising Law" or "FAL"); (5) breach of fiduciary duty; (6) aiding and abetting breach of fiduciary duty; and (7) unjust enrichment and imposition of constructive trust.  On December 22, 2005, Healey filed suit against Allianz, alleging similar claims for relief.  The Court ordered coordination of the two actions as related cases (collectively, "Negrete").  On November 21, 2006, the Court granted plaintiffs' motion for class certification as to their nationwide RICO claim, as well as a California-only subclass asserting statutory violations, including the UCL.  Negrete Dkt. No. 134 ("Class Order").

On March 12, 2010, Allianz moved for summary judgment on the RICO claims of certain Negrete class members which it contended were barred by the doctrine of claim preclusion as a result of the final judgment entered in Allianz's favor on January 29, 2010 in Mooney v. Allianz Life Ins. Co. of N. Am., Case No. CV 06-00545 ADM/FLN (D. Minn) ("Mooney").  In an order issued August 18, 2010 (the "Claim Preclusion

Order"), the Court denied Allianz's motion for summary judgment and granted plaintiffs' cross-motion for partial summary judgment on Allianz's affirmative defense of claim preclusion.  Claim Preclusion Order at 24.

On June 10, 2011, Allianz filed a renewed motion for summary judgment on the RICO claims.  On October 13, 2011, the Court denied the motion, finding that disputed issues of material fact precluded summary judgment on the required elements of (1) a RICO enterprise; (2) an injury "by reason of" the conduct constituting the alleged RICO violation; and (3) a RICO conspiracy.  Dkt. No. 805.  The Court also denied defendant's motion to exclude the declaration of Dr. Craig McCann, plaintiff's chief expert, on the same date.  Dkt. No. 804.

On May 30, 2012, Allianz filed a motion to decertify the class.  Dkt. No. 830.  On August 14, 2012, plaintiffs filed their opposition.  Dkt. No. 851.  Allianz filed a reply on October 15, 2012.  The Court heard oral argument on November 8, 2012.  After considering the parties' arguments, the Court finds and concludes as follows.

## II.    BACKGROUND

### A.    Factual Background

The facts of this case are well-known to the parties and set forth more fully in the Court's prior orders.  In brief, plaintiffs allege that Allianz sold deferred annuities to elderly class members through a standardized sales program premised upon three key misrepresentations: that Allianz's annuities carried "no sales charges," offered an "immediate bonus," and would pay "full value" if certain deferral requirements were met.  Plaintiffs allege that these descriptions were false and misleading, as Allianz in fact paid exorbitant commissions to its sales agents, and a policyholder could not receive the "full value" of their annuity unless it remained in deferral for at least five years, with payout taken over at least ten years.  In addition, plaintiffs allege that certain annuity purchasers had the value of their annuity further reduced by the "expense recovery adjustment" ("ERA"), which plaintiffs characterize as an undisclosed "reduction to the

purchaser's annuitization value, resulting in lower annuitization payments." Along with the ERA, plaintiffs also offer evidence that Allianz lowered the yields of its annuities to recoup the cost of the bonus and the sales commissions ("yield reductions"). Plaintiffs allege that the ERA, coupled with the yield reductions, effectively precluded annuity holders from realizing any premium bonus.

These three key descriptions of the Allianz annuities were contained in sales brochures that Allianz agents were required to provide to prospective purchasers, along with a Statement of Understanding ("SOU"). Upon signing the SOU, annuity purchasers acknowledged that they had received and read the relevant sales brochure. In addition, the sales agent countersigned that he or she had not made any representations that diverged from the content of the brochure. The brochures did not discuss how Allianz allegedly recouped the bonus and sales commissions through reduced annuity yields or the ERA. Plaintiffs contend that the three alleged misrepresentations, as part of Allianz's scheme to defraud elderly purchasers, have caused "direct and quantifiable injury" to the members of the class, because the Allianz "annuities are necessarily worth less as a result of the undisclosed hidden charges" on the date of purchase. Opp'n at 4.

### B.   Prior Class Order

On November 21, 2006, the Court granted plaintiffs' motion for class certification as to their nationwide RICO claim. Class Order at 26–27. First, the Court found that the Rule 23(a) requirements of numerosity, typicality, and adequacy of representation were met. Id. at 8–10. As to typicality, the Court noted that "plaintiffs' claims are based on an alleged common course of conduct by Allianz to 'illegally target seniors'. . . as part of a 'single overarching fraud scheme.'" Id. at 8. In rejecting Allianz's argument, the Court noted that "variations in the degree of injury allegedly suffered by each class member do not defeat typicality." Id. at 10 n. 8. In addition, the Court found that commonality was satisfied, because "the class members' claims derive from a common core of salient facts, and share many common legal issues." Id. at 9. Theses common factual and legal

4

issues include "whether Allianz entered into the alleged conspiracy and whether its actions violated the RICO statute." Id.

Second, in addressing the Rule 23(b)(3) inquiry, the Court noted that "the crucial question" is whether there is (1) "a plausible class-wide method for proving that the defendant's misstatements or omissions about the economic value and benefits of the annuities in question *caused* injury to the members of the class"; and (2) "a plausible class-wide method for proving *damages*." Id. at 12 (emphasis added). The Court first addressed the threshold question of whether reliance is required to state a RICO claim, finding that "this is a case where proof of reliance is 'a milepost on the road to causation.'" Id. at 14 (citing Caesars World, Inc. v. Poulos, 379 F.3d 654, 664 (9th Cir. 2004)). The Court reasoned that "proof that defendant's alleged deceptive practices proximately caused members of the class to suffer concrete financial loss. . . depend[s] on showing that class members made investment decisions *based on* material misinformation and omissions." Id. (emphasis added). Moreover, the Court rejected plaintiff's argument that reliance could be presumed, as this case is based upon alleged affirmative false written statements, not omissions. Id.

The Court also rejected plaintiff's argument that evidence that defendant and its agents engaged in a common course of deceptive conduct was sufficient to establish defendant's liability for fraudulent misrepresentation. Id. at 15. The Court reasoned that because "the misrepresentations standing alone have little legal significance," plaintiffs must show that each class member (1) received a misrepresentation and (2) relied on this misrepresentation to their detriment. Id. (citations omitted).

Therefore, the Court concluded that plaintiffs could demonstrate that class certification was appropriate, if plaintiffs could demonstrate the following: First, class certification would be appropriate if plaintiffs could prove that "uniform representations were made to all class members which were misleading because they failed to disclose that [1] all of the annuities at issue were worth less than the purchase prices paid for

them or [2] are fundamentally inferior to comparable products." Id. at 16. This showing would satisfy the proximate cause requirement of plaintiffs' RICO claim. Second, the Court found that if the annuities are "worth substantially less than the prices paid for them," or if a "common sense inference" is available because "no rational class member would purchase the annuities in question upon adequate disclosure of the facts," then generalized proof based upon the common misrepresentations may supply a means of establishing class-wide proof of damages. Id.

The Court found that plaintiffs could potentially make this showing here. First, based on their evidence of "standardized written presentations, coupled with [their] allegations that class members purchased annuity products far less valuable than other comparable products or the prices paid for them," plaintiffs could establish the existence of a class-wide means of seeking to prove proximate causation under Poulos for purposes of class certification. Id. at 17. This included evidence that Allianz: (1) "prepared standardized consumer brochures and SOUs for each annuity product"; (2) "required both the purchaser of the annuity and the agent sign the SOU at the time of sale," attesting to the fact that the purchaser "had read and understood the information set forth therein, which had also been explained by the sale agent"; (3) the agent's attestation that he or she "had not made statements that differ from the disclosure form." Id. at 17. Second, with regard to class-wide proof of damages, the Court found that the financial circumstances of the individual class members were irrelevant, "because plaintiffs have accepted a high bar for proving their case, namely, that no rational senior would have bought any of the Allianz deferred annuities if they had known the truth." Id. at 18. As such, plaintiffs could rely on an inference of reliance based on the theory that no rational senior would have purchased the annuities, absent the misrepresentations. Id.

### C.    Developments Since the Court's Class Order

The parties dispute precisely what has transpired in this litigation since the Court initially certified the class.  The parties do not dispute that pursuant to this Court's original Class Order, notice was mailed to absent class members apprising them of their right to opt-out.  See Dkt. No. 268 (March 8, 2008).  Plaintiffs note that they have adopted a "refined" theory of damages, in addition to winnowing the number of Allianz products at issue in this litigation.  Friedman Decl. ¶ 4.  Plaintiffs' damages theory is discussed in more detail below.  As to products, according to plaintiffs, their revised class claims now cover twenty annuity products, as plaintiffs seek to remove nineteen annuity products from the class claims.  Id. ¶ 9.  These are the Annuitizer, Cash Bonus Elite, Cash Buffet, the Dominator Five through Ten series, Ideal, Ideal Index, Ideal Index 75 and 100, Powerhouse, PowerRate 5, PowerRate 5 Elite, Accumulator X, Accumulator Classic, and the InCommandDex.  (collectively, the "Excluded Products").  Id.  Plaintiffs contend that the Excluded Products gave rise to only 6% of the total premiums collected by Allianz during the class period.  Id. ¶ 12.

Defendant contends that plaintiffs have adopted a new, untested theory of damages and liability.  Defendant also objects to any unilateral narrowing of the class products by plaintiffs' counsel, absent new notice being provided to members of the class who will no longer be represented in this litigation.  See Reply at 3; Reply Decl. of Denise Fee ¶ 8 (detailing defendant's analysis of the number of potential class claims per product).  At oral argument, counsel for plaintiffs agreed that new notice must be provided, and that if the Court is inclined to maintain certification of the class, plaintiffs would bear the cost of providing notice to those current class members who would no longer be members of the class.  The Court agrees, and finds that if the class certification order is modified to exclude class members, then under Diaz v. Trust Territory of Pac. Islands, 876 F.2d 1401, 1408 (9th Cir. 1989), such notice is required.

//

### III.   LEGAL STANDARD

"Class actions have two primary purposes: (1) to accomplish judicial economy by avoiding multiple suits, and (2) to protect rights of persons who might not be able to present claims on an individual basis." Haley v. Medtronic, Inc., 169 F.R.D. 643, 647 (C.D. Cal. 1996) (citing Crown, Cork & Seal Co. v. Parker, 462 U.S. 345 (1983)). Federal Rule of Civil Procedure 23 governs class actions.  For a suit to be maintained as a class action, the proposed class must "satisfy the criteria set forth in subdivision (a). . . , and it also must fit into one of three categories described in subdivision (b)." Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co., — U.S. —, 130 S.Ct. 1431, 1437 (2010).  More than a pleading standard, Rule 23 requires the party seeking class certification to "affirmatively demonstrate . . . compliance with the rule." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. ---, ---, 131 S.Ct. 2541, 2551 (2011).  This requires a district court to conduct "rigorous analysis" that frequently "will entail some overlap with the merits of the plaintiff's underlying claim." Id.

First, plaintiffs must demonstrate that the four requirements of Rule 23(a) are met: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. These requirements effectively "limit the class claims to those fairly encompassed by the named plaintiff's claims." Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 155 (1982) (quoting Califano v. Yamasaki, 442, U.S. 682, 701 (1979)).

Second, if a court finds that the Rule 23(a) requirements are met, the court must consider whether the class is maintainable under one of the three alternatives set forth in Rule 23(b). Dukes, 131 S. Ct. at 2548.  Plaintiffs here seek to maintain certification under Rule 23(b)(3), which requires "that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"The Rule 23(b)(3) predominance inquiry tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1022 (9th Cir. 1998) (citing Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997)).  If "common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication," then adjudication on a representative basis is appropriate.  Id.  Otherwise, individualized adjudication is more appropriate.  Therefore, the Court must balance concerns regarding the litigation of issues common to the class as a whole with questions affecting individual class members.  In re N.D. Cal., Dalkon Shield IUD Products Liability Litig., 693 F.2d 847, 856 (9th Cir. 1982).

In determining superiority, the court must consider the four factors of Rule 23(b)(3): (1) the interests that members in the class have in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigations concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely encountered in the management of a class action.  See Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1190–1193, (9th Cir. 2001) (opinion amended on denial of reh'g, 273 F.3d 1261).

Under Federal Rule of Civil Procedure 23(c)(1)(C), a "[a] district court may decertify a class at any time." Rodriguez v. West Publ'g Corp., 563 F.3d 948, 966 (9th Cir. 2009); see also Officers for Justice v. Civil Serv. Comm'n of City & County of San Francisco, 688 F.2d 615, 633 (9th Cir. 1982) (describing a class certification order as "inherently tentative").  In deciding whether to decertify, a court may consider "subsequent developments in the litigation," Falcon, 457 U.S. at 160, including "previous substantive rulings in the context of the history of the case, and. . . the nature and range of proof necessary to establish the class-wide allegations," Marlo v. UPS, 251 F.R.D. 476, 479 (N.D. Cal. 2008).  The standard is the same for class decertification as it

9

is with class certification: a district court must be satisfied that the requirements of Rules 23(a) and (b) are met to allow plaintiffs to maintain the action on a representative basis. Marlo v. United Parcel Serv., Inc., 639 F.3d 942, 947 (9th Cir. 2011).[1]

**IV.   DISCUSSION**

Because defendant only moves for decertification based on arguments made regarding Rule 23's requirements of commonality, typicality, and predominance, the Court will address only these requirements in turn.

**A.   Commonality**

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury . . . [and] [t]heir claims must depend upon a common contention . . . of such nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Dukes, 131 S. Ct. at 2551 (internal quotation marks and citations omitted).  "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." Id. (citation omitted).

Plaintiffs contend that the following three alleged common misrepresentations are fundamental to this litigation and the existence of common proof regarding these

---

[1] To the extent that pre-Marlo cases conclude that a defendant bears the burden on a motion to decertify of demonstrating that "the elements Rule 23 have not been established," Gonzales v. Arrow Fin. Servs. LLC, 489 F. Supp. 2d 1140 (S.D. Cal. 2007), these cases are no longer good law.  Because class certification decisions are "inherently tentative" and Dukes teaches that the requirements of Rule 23 must "actually" be met, plaintiffs bear the ultimate burden of demonstrating that the elements of class certification are satisfied.  Marlo., 639 F.3d at 947 (holding that "as to the class-decertification issue, [plaintiff], as the party seeking class certification, bears the burden of demonstrating that the requirements of Rules 23(a) and (b) are met.") (quotations and alterations omitted).

misrepresentations make class certification as, if not more, warranted in this case than it was five years ago:

- Allianz represented that its annuities had no "sales charges" when in reality Allianz recouped exorbitant agent commissions through onerous surrender penalties, lower credits to account values and lower annuitization payments.

- Allianz represented that the annuities would receive an "immediate bonus" without disclosing that Allianz clawed back the promised bonus also through surrender penalties, lower account credits and lower annuitization payments.

- Allianz represented that the annuities would pay the "full value" [or "annuitization value"] if certain deferral requirements were met without disclosing that Allianz actually reduced the annuity values through an undisclosed "haircut" to the annuitization rates.

Def.'s Ex. 5 (Pls.' L.R. 16 Stmt.) at 57–58, 67.  Plaintiffs argue that determining whether class members suffered an injury, caused by any or all of these misrepresentations, presents the Court with "squarely framed" common questions of fact and law to which "single stroke" answers are available.  Opp'n at 15.

Allianz argues that plaintiffs no longer present questions of law and fact that have common answers "apt to drive the resolution" of this litigation.  First, Allianz argues that there are material differences in the class products at issue.  This includes products that did not offer an up-front premium bonus; single-tier products that have a declining surrender charge over time (compared to two-tiered products, which have separate annuitization and cash surrender values); products with different withdrawal options; products with different interest rate guarantees; and products with different commissions paid to field agents, some below plaintiffs' "benchmark" level.  Mot. at 16–18; Def.'s Ex. 33 ("Product Chart") (detailing defendant's characterization of various other features

of the class products, including indexing, annuity term, length of interest rate cap, withdrawal of interest, and acceleration of annuitization).

Second, Allianz contends that are thousands of brochures at issue for these class products that differ in material respects, including the language of the SOU, which precludes a finding of commonality. Mot. at 19. Allianz admits that references to "immediate bonus," "no sales loads," or "full value" can be found in most brochures, but argues that few include all three of these descriptions which are alleged to be misleading. Id. Even comparing brochures containing similar descriptions, defendant argues that "the specific articulation, and surrounding explanations vary widely across products, time, and jurisdiction of sale." Id.; see Def.'s Ex. 1 ("Brochure/SOU Chart") (detailing, *inter alia*, the pages in each brochure, defendant's characterization of whether the SOU made any representations as to future guaranteed value).

Third, Allianz argues that divergent answers will exists as to whether the sales materials were read and relied upon by class members. Mot. at 21. Allianz contends that "receipt of a brochure and [subscription to an] SOU does not necessarily mean that it was read, relied upon, or understood." Id. Even presuming that a class member was influenced by a brochure in deciding to purchase an annuity, Allianz argues that numerous additional questions must be answered, including how the class member interpreted the statements at issue or if the class member understood them at all. Id. Allianz also contends that differences among individual class members' finance backgrounds, previous purchasing experience, and relative levels of wealth precludes a finding of commonality. Mot. at 21.

Finally, Allianz argues that class member-agent interactions are too diverse to permit a finding of commonality. Id. at 23; Def.'s Ex. 55 (Prof. William Wilkie Expert Report) at 749 ("the purchasing processes will have differed significantly within this very large class"). Even though all the agents and class members had to sign an SOU attesting to the fact that no additional representations were made beyond the written

materials, defendant argues that "the specific policy recommendations of the agent will be given great weight. . . . The impact of [the brochures and SOUs] will be less central and less influential in the purchase process than the actions of the agent."  Mot. at 24 (quoting Ex. 55 (Wilkie Rept.) at 744.  Thus, Allianz argues that these "discussions are not subject to common proof, but rather raise individual issues that predominate over any other common issues in this case."  Id. (quoting In re Countrywide Fin. Corp. Morg. Mktg. and Sales Practices Litig., Nos. 08-MDL-1988, 10-cv-0257, 2011 WL 6325877, at *10 (S.D. Cal. Dec. 16, 2011) ("Countrywide II").

In opposition, plaintiffs argue that the propriety of certification here is confirmed by Yokohama v. Midland Nat'l Life Ins. Co., 594 F.3d 1087 (9th Cir. 2010), In re First Alliance Mortgage Company, 471 F.3d 977 (9th Cir. 2006), and In re Nat'l Western Life Ins. Deferred Annuities Litig., 268 F.R.D. 652 (S.D. Cal. 2010) ("Nat'l West I").  Moreover, plaintiffs argue that Allianz's attempt to "emphasize every conceivable difference in every sales transaction" was already rejected by this Court in granting plaintiffs' motion to certify the class.  Opp'n at 16.

First, as to products, plaintiffs argue that Allianz has offered no new facts that would justify decertification.  Plaintiffs contend that they have made the class "more cohesive," because they have "culled from the class claims those annuity products that were not subject to the challenged misrepresentations or that do not exhibit recoverable class-wide damages resulting from those misrepresentations."  Id. at 2.  Plaintiffs contend that after this winnowing, all of the class products were sold with the alleged misrepresentations regarding the sales charge and the haircut, and seventy-five percent of the class products featured the premium bonus claim.[2]  Id. at 17.  Moreover, plaintiffs argue that there are no material differences between single-tier versus two-tier annuities for purposes of plaintiffs' case, because in either instance class members "paid for the

---

[2] Because McCann's new damages theory disaggregates the damages suffered by each class member based upon which alleged misrepresentations they were exposed to, plaintiffs argue that this theory supports a finding of commonality.  Opp'n at 17.

purported [premium] bonus through lower credited rates, caps, or other penalties and charges."  Id.  In addition, plaintiffs contend that any differences relating to the penalty-free withdrawal provisions of Allianz products—which if not utilized, would result in surrender charges for purchasers—are irrelevant, because plaintiffs only offer this evidence as proof of Allianz's alleged overarching fraud targeted at senior citizens.  Id. at 17 n. 11.  Finally, plaintiffs note that there is a common answer to the question of whether a given commission is excessive, regardless of the class product at issue.  Id. at 18.  Once a jury determines the permissible benchmark for sales commissions, a comparison can be made with the commission by which class products were burdened, and the alleged overcharge paid by individual class members can be readily determined using a class-wide method of proof.  Id. at 18–19.

Second, plaintiffs argue that commonality remains satisfied based on the sales materials at issue, because "a comprehensive analysis of the brochure language at issue demonstrates the undeniable core consistencies."  Opp'n at 19.  Plaintiffs argue that in fact, there are only 865 distinct brochures at issue, not the over two thousand claimed by Allianz.  Id. at 18 n. 14; see Pls.' Ex. 88 (Class Products Brochure Summary Chart).  With regards to the "no sales charge" language, plaintiffs note that 746 of the brochures contain the allegedly false representation, and of those that do not, a third of these are limited to two products.  Id. at 21; Pls.' Ex. 89 (Hidden Sales Charges Summary Chart) & Ex. 90 (Hidden Sales Charges Tally Chart).  The bulk of the remaining brochures without such language are limited to two states, Maryland and Indiana.  Id. at 21.  Next, as to the alleged haircut misrepresentation, plaintiffs argue that the adjective "full" is redundant, because the term "annuitization value" or "accumulation value" has a defined meaning unchanged by the modifier "full."  Id. (citing Pls. Ex. 76, MasterDex 10 Annuity Contract, which contains a definition of "annuitization value").  By not excluding brochures lacking this unnecessary modifier, plaintiffs contend that all of the

14

brochures for the class products contain the same misrepresentation.[3]  In addition, plaintiffs make a similar argument in regards to the premium bonus claim, noting that whether the purported bonuses were "up-front" or "immediate" is immaterial to their allegations, because the alleged misrepresentation is based on Allianz's failure "to inform policyholders that it would recoup the bonus over time through lower caps, rates, and other penalties." Id. at 22.  Therefore, without this limitation, all the brochures describing the premium bonus are misleading.

Third,  plaintiffs contend that individual class member attributes are irrelevant to the class certification decision.  Therefore, any evidence pertaining to individuals who exercised their right to opt-out, or regarding subsequent annuity purchases by members of the class, should be disregarded.  Id. at 23.  This includes any evidence that Healey or Ow are atypical from the class based on their age, education, past experience or wealth. Plaintiffs argue that "purported differences in sophistication or wealth, or upon unique interpretations of contract language" do not defeat certification.  Id. at 24.[4]

Finally, plaintiffs argue that any comparison to In re Countrywide is misplaced. The "critical factor" in that case, plaintiffs contend, was the court's finding that the mortgage sales agents there had not signed anything attesting to the fact that they said nothing contrary or in addition to the written materials.  Id. at 25 (citing Countrywide II, 2011 WL 6325877, at *5).  Plaintiffs argue that Allianz required the SOU certifications here, distinguishing this case from Countrywide II.

---

[3] Plaintiffs also note that defendant's marketing and industry experts testified that the haircut (or expense recovery adjustment) was not disclosed to consumers.  Id. at 22 n. 16 (citing Pls.' Ex. 18, Wilkie Depo. at 28:10-14; Pls.' Ex. 19, Lynch Depo. at 52:15–22.

[4] Citing to, inter alia, Kennedy v. Tallant, 710 F.2d 711, 717 (11th Cir. 1983); Ewert v. eBay, Inc., No. 07-cv-2198, 2010 WL 4269259, at *3 (N.D. Cal. Oct. 25, 2010); Public Employees' Retirement Sys. v. Goldman Sachs Group, Inc., No. 09-cv-1110, 2012 WL 36146, at *6 (S.D.N.Y. Feb. 3, 2012).

In reply, Allianz argues that plaintiffs' attempt to narrow the class definition concedes that the class is unmanageable, as Allianz argued previously in response to plaintiffs' motion to try the class in two phases. Reply at 4. Moreover, <u>First Alliance</u> and <u>Yokohama</u> are readily distinguishable, Allianz contends, because both of these cases are focused on the required elements of state fraud claims, not RICO. Reply at 8. Particularly after <u>Dukes</u>, plaintiffs must do more than offer a "facially plausible method for showing causation and impact across-the-board," Allianz argues. <u>Id.</u> at 7 (quoting Class Order at 19).

Allianz also disputes plaintiffs' characterization of the similarities of the misrepresentations in the brochures at issue, arguing that even under plaintiffs' analysis, differences in the brochures are what is most common. It notes that Ow and Healey's products are excluded from any claim for "no sales charges," because these product brochures did not contain the offending language. <u>Id.</u> at 18. In addition, Allianz replies that the use of the modifier "full" to the term "annuitization value" and "accumulation value" language was always considered a necessary part of the alleged misrepresentation. <u>Id.</u> at 19. Without such a modifier, Allianz argues that plaintiffs lack a method of generalized proof. Further, it contends that the "5x10" requirement—that an annuitant must hold the policy in deferral for at least five years and take payout over a period of at least ten years—does not apply to most of the class products. <u>Id.</u> (citing Def.'s Ex. 33, Chart of Product Chars.). Allianz also disputes plaintiffs' characterization of the bonus allegation, noting that term "immediate" has always been part of the alleged misrepresentation. <u>Id.</u> at 20.

Finally, Allianz argues that the named plaintiffs' products and brochures also demonstrate that commonality is not met. <u>Id.</u> at 21-24. Allianz contends that the bonus claim is inapplicable to any surrendered policies, including Ow's MasterDex 10 and Healey's Bonus Maxxx, because the cash surrender value was a specified amount disclosed in the underlying contract. <u>Id.</u> at 21. Moreover, the four Ow and Healey class

products were sold via 158 different brochures.  Id. at 22.  Even if the Court permits plaintiffs to pare down the number of class products at issue, Allianz argues that too many "individualized hurdles" to class litigation remain.  Id.

Upon consideration of the parties' arguments, the Court finds there are sufficient similarities among the claims regarding the class products and class members to establish commonality.  Even after Dukes, the commonality inquiry does not require plaintiffs to demonstrate the "predominance" of common issues over individualized ones, nor the "cohesion" of the class.  See Dukes, 131 S. Ct. at 2556 (disclaiming any intent to overlap "Rule 23(a)(2)'s commonality requirement with Rule 23(b)(3)'s inquiry into whether common questions 'predominate' over individual ones").  Instead, for purposes of satisfying Rule 23(a)(2), "even a single common question" leading to a common answer will do.  Id. (citations and alterations omitted).  Disputes over the commonality of products, brochures, and brochure language fail to show why other elements of plaintiffs' RICO claim do not raise common questions, including the existence of an intentional scheme to defraud.  Unlike in Countrywide I, where the court found such an issue could not be resolved in "one stroke," representative litigation here will generate a common answer as to the existence of a scheme to defraud.  See Dkt. No. 805 (MSJ) at 6–13, 22–23 (noting that genuine issues of material fact remain as to existence of an association-in-fact enterprise and a conspiracy in this case).  In addition, because plaintiffs' rely on an out-of-pocket theory of damages measure, such damages can be shown by class-wide methods of proof if a jury finds that a violation of RICO has occurred.

Moreover, plaintiffs present multiple common questions capable of common resolution, all centered around the three alleged misrepresentations that form the core of this lawsuit.  The minor differences in the language of these alleged misrepresentations may present individual issues, but any such issues "go to predominance under Rule 23(b)(3), not to whether there are common issues under Rule 23(a)(2)."  Mazza v. Am.

17

Honda Motor Co., Inc., 666 F.3d 581, 589 (9th Cir. 2012).  As plaintiffs have demonstrated by a thorough analysis of all of the brochures for the class products at issue here, any differences in brochure language are not so stark as to defeat commonality on the question of whether each alleged misrepresentation was in fact a misrepresentation.  See, e.g., Pls.' Exs. 89 (Hidden Sales Charges Summary Chart), 91 (Full Value Summary Chart) & 92 (Illusory Bonus Summary Chart) (detailing the brochure language at issue).  That plaintiffs may have broadened the scope of their alleged misrepresentations—by not requiring the modifiers "full" or "immediate" in order to claim that a brochure contains the alleged haircut or bonus misrepresentations, respectively—does not defeat a finding of commonality, even if such a redefinition ultimately makes plaintiffs' claims less compelling on the merits, as defendant appears to argue, not less common.  Moreover, Allianz has not demonstrated that differences in the font size or location of the alleged misrepresentations relative to other language in the brochures defeats a finding of commonality, as the differences are not material.  See First Alliance, 471 F.3d at 992 ("The class action mechanism would be impotent if a defendant could escape much of his potential liability for fraud by simply altering the wording or format of his misrepresentations across the class of victims.").[5]  Although multiple brochures are at issue in this case, the relevant language at issue is essentially the same across all of them, and this supports a finding of commonality.  See In re Nat'l W. Life Ins. Deferred Annuities Litig., 268 F.R.D. 652, 664 (S.D. Cal. 2010) (finding commonality met where the representations made were "uniform in material part").

---

[5] The Court recognizes that First Alliance and Yokohama, 594 F.3d 1087, are distinguishable because neither is a RICO case.  Under the UCL, plaintiffs are not required to prove the reliance of all individual absent class members on a misrepresentation, so long as the class representatives can show that they relied.  Under Hawaii's consumer protection statute, only a reasonable consumer's perspective is at issue.  Nonetheless, these decisions show why variations in the language used by a defendant may be immaterial for purposes of class certification.

Differences in the products that Allianz identifies, including the availability of other benefits that may have influenced class members' decisions, also does not defeat a finding of commonality.  As with the differences in the brochures, the differences that Allianz identifies do not detract significantly from the fundamental allegations of fraud that plaintiffs have identified as constituting the core of their case.  The alleged fraudulent representations are what drives the outcome of this litigation towards a resolution, not whether the annuity product at issue had some peripheral features that may differ in some respects from other annuities.  The same goes for the level of commissions paid to sales representatives at various times for various products; the Court agrees with plaintiffs that the jury can determine an appropriate "benchmark" commission rate and then damages may be calculated for those policies that exceed this rate.  Allianz does not show "how any difference bears upon the misrepresentations at issue" for purposes of establishing commonality.  See Iorio v. Allianz Life Ins. Co. of N. Amer., No. 05-cv-0633 at 40 (S.D. Cal. July 8, 2008) (Iorio Decert. Order).

Although the "crucial question" in this litigation may be whether class members relied on any of the alleged misrepresentations to their detriment, all that is required is a single common question for plaintiffs to satisfy their "limited burden" under Rule 23(a)(2).  Mazza, 666 F.3d at 589 (noting that only a "single significant question of law or fact" is required, not that the common question be the most "crucial" one).  In any event, the common questions identified herein—including the existence of a scheme to defraud and whether the statements are fraudulent—are "crucial" questions for the viability of plaintiffs' RICO claims as well.  As such, Allianz's arguments regarding the individualized inquiries needed to demonstrate reliance on the alleged misrepresentations, the different characteristics of the class members, and the different agent-member interactions are really arguments regarding the predominance of individualized issues over common ones.  None of these potential issues, which are taken up in greater detail in discussing predominance, preclude a finding of at least one

common question that can drive the outcome of this litigation.  Plaintiffs' (and

defendant's) evidence, taken as a whole, demonstrates that the commonality requirement

remains satisfied under Dukes.

## B.    Typicality

Defendant's second argument in favor of class decertification attacks the

typicality of Ow and Healey's claims, arguing that "unique defenses" preclude a finding

that typicality has been met.  "The purpose of the typicality requirement is to assure that

the interest of the named representative aligns with the interests of the class." Wolin v.

Jaguar Land Rover North Am., LLC, 617 F.3d 1168, 1175 (9th Cir. 2010).  "The test of

typicality 'is whether other members have the same or similar injury, whether the action

is based on conduct which is not unique to the named plaintiffs, and whether other class

members have been injured by the same course of conduct.'"  Ellis v. Costco Wholesale

Corp., 657 F.3d 970, 984 (9th Cir. 2011) (quoting Hanon v. Dataproducts Corp., 976

F.2d 497, 508 (9th Cir. 1992)). Thus, typicality is satisfied if the plaintiffs' claims are

"reasonably co-extensive with those of absent class members; they need not be

substantially identical." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998).

Allianz argues that it has a complete defense to Ow's claims regarding his

MasterDex 10 annuity, because this claim, in addition to 10,978 other Negrete class

members' claims, is barred by the release in the Iorio Final Order.  See Dkt. No. 812,

814 (granting parties' stipulation that the Iorio final order extinguishes all claims that

fall within the definition of "Released Transactions").  In addition, Allianz argues that it

has three unique defenses in regards to Ow's claims arising from his Power 7 and

FlexDex MutliChoice annuities: (1) the Power 7 brochure never used the language "no

sales charge," Def.'s Ex. 46; (2) both Power 7 and FlexDex MultiChoice are single-tier

policies, such that defendant contends the premium bonus was paid upon termination;

and (3) the alleged misrepresentation regarding the "haircut" is irrelevant, because Ow

did not annuitize his policies, and the haircut only applies in calculating the payout. Mot. at 25–26.

As to Healey, Allianz argues that it has a reverse-preemption defense to her RICO claim, because she purchased her annuity in a state "whose insurance trade practice laws bar or curtail private claims, including RICO claims." Mot. at 26. In addition, Allianz asserts various "fact-specific defenses," including Healey's "considerable annuity buying experience" vis-à-vis other class members, and her decision to surrender her annuities for cash rather than annuitize them. Id.

In opposition, plaintiffs contend that even assuming there are unique defenses to the class representatives' claims, these defenses would not be a "major focus" of the litigation such that the representative would become "preoccupied" by the unique defense. Opp'n at 26 (citing Hanon, 976 F.2d at 508). Therefore, any such defense should not defeat certification on typicality grounds. In particular, plaintiffs argue that the two main defenses raised by Allianz these raise legal issues—as to whether Ow's (and others) claims are barred by Iorio and whether Healey's claims (and others) are subject to reverse-preemption—that the Court can decide before trial. Opp'n at 27. In addition, plaintiffs contend that Allianz's fact-based defenses are inapplicable, because plaintiffs' theory of liability and out-of-pocket damages are not dependent on whether or not the policyholder annuitized their policy or surrendered it. Id. at 28.[6]

The Court agrees with plaintiffs that Ow and Healey's claims remain typical of the class. First, as to the unique legal barriers that Allianz asserts bars Ow and Healey's claims, the Court finds that these defenses are not atypical and can be resolved before trial. As Allianz notes, thousands of potential class member claims are potentially subject to these same legal defenses, and therefore Ow and Healey are not necessarily atypical representatives. Although proof that a defense will ultimately defeat a class members claims is not required to defeat a showing of typicality, see Cholakyan v.

_____

[6] Allianz reiterates the same arguments in reply to plaintiffs' opposition.

Mercedes-Benz, USA, LLC, 281 F.R.D. 534, 557 (C.D. Cal. 2012), these defenses will not be unduly preoccupying here.  Second, as to the fact-based defenses that Allianz raises, these are either not atypical, or they do not undermine plaintiffs' out-of-pocket theory of damages and therefore may be irrelevant.  Allianz's defense as to Ow and Healey's failure to annuitize is a defense that, if relevant, will be common to many other members of the class as well.  Healey's significant annuity purchasing experience may render her a more atypical representative than others, but this fact standing alone does not render her situation unique.

In short, there is no indication that lead plaintiffs here did not otherwise suffer the same alleged injury caused by the same alleged course of wrongful conduct, or that Ow and Healey's interests in prosecuting this action diverge from that of absent class members.  See Ellis, 657 F.3d at 984.  Accordingly, the Court finds that typicality remains satisfied.[7]

## C.   Predominance

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." Erica P. John Fund, Inc., v. Halliburton Co., ––– U.S. ––––, ––––, 131 S. Ct. 2179, 2184 (2011).  With this in mind, the Court first addresses the RICO legal framework that determines the elements plaintiffs will have the burden of proving at trial.

## 1.   RICO Legal Framework

Plaintiffs allege RICO violations under 18 U.S.C. §§ 1962(c) and (d); the essential elements of a § 1962(c) claim are (1) conduct (2) of an enterprise (3) through a pattern of (4) racketeering activity.  Stanford v. MemberWorks, Inc., 625 F.3d 550, 557 (9th Cir.

---

[7] The Court agrees with plaintiffs that even if the named representatives no longer satisfied the typicality requirement, the proper procedure would not be to decertify the class (assuming other Rule 23 requirements remain satisfied), but to appoint new class representatives.  See Guido v. L'Oreal, USA, Inc., 2012 WL 2458118, at *3, 5 (C.D. Cal. June 25, 2012) (staying case until new class representatives are appointed).

2010).  The RICO statute defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C § 1961(4).  "Racketeering activity" is defined as certain criminally indictable acts, including mail and wire fraud. Id. § 1961(1).  A violation of the mail fraud statute requires proof that the defendant (1) formed a scheme to defraud, (2) used the mails to further the scheme, and (3) "did so with the specific intent to deceive or defraud."  Miller v. Yokohama Tire Corp., 358 F.3d 616, 620 (9th Cir. 2004).  The essential element of a § 1962(d) claim is a conspiracy to violate other sections of the RICO statutes.  Important here, any RICO claim for damages also requires proof of an injury to "business or property by reason of a violation of section 1962."  18 U.S.C. § 1964(c).

With respect to the requirement of injury, plaintiffs allege an injury under an out-of-pocket loss theory: "the difference in actual value between what the plaintiff[s] gave and what [they] received."  In re First Alliance Mortg. Co., 471 F.3d 977, 1001–02 (9th Cir. 2006); see also Opp'n at 11.  "The out-of-pocket measure restores a plaintiff to the financial position he enjoyed prior to the fraudulent transaction, awarding the difference in actual value between what the plaintiff gave and what he received."  First Alliance, 471 F.3d at 1002 (citations omitted).  In contrast, "[t]he benefit-of-the-bargain measure places a defrauded plaintiff in the position he would have enjoyed had the false representation been true, awarding him the difference in value between what he actually received and what he was fraudulently led to believe he would receive."  Id.

As the Court found previously in denying Allianz's renewed summary judgment motion, out-of-pocket damages are measured as of the date of the transaction, not some later date.  Dkt. No. 806 at 15.  The Court found that plaintiffs' expert, Dr. McCann, has "isolated the damages directly attributable to each of Allianz's misrepresentations and omissions by separately quantifying the diminished values resulting from the excessive commissions, the ERA, and the illusory bonuses."  Id. at 15–16.  By performing this

calculation, plaintiffs claim to be able to prove that they suffered, at the moment of purchasing the annuities, "immediate and tangible out-of-pocket losses in the form of overpayments for financial products due to fraudulent misrepresentations by Allianz." <u>Id.</u> at 17.[8]  Plaintiffs further note that under Dr. McCann's analysis, each class member will be awarded "only those damages directly attributable to the misrepresentations actually made to each class member with respect to the particular product purchase." Opp'n at 11.  <u>See</u> <u>In re Nat'l W. Life Ins. Deferred Annuities Litig.</u>, 268 F.R.D. 652, 667 (S.D. Cal. 2010) (describing plaintiff's theory that "the earnings of Plaintiffs' annuities were diminished by Defendant unlawful scheme to misrepresent the bonus and upfront sales charges" and noting that even if plaintiffs made money on their annuities, they made "less money than they would have absent the defendants' conduct").

In addition, the statute's "by reason of" language requires proof of "but for" causation, proximate causation, and a concrete financial loss to a protectable business or property interest.  <u>See</u> <u>Hemi Group, LLC v. City of New York</u>, 130 S. Ct. 983, 989 (2010).  Plaintiffs again argue that proof of reliance is not required to prove causation in a civil action under RICO premised on mail fraud, citing to the Supreme Court's

---

[8] Dr. McCann's opinion is discussed in detail in the Court's order denying Allianz's motion to exclude Dr. McCann's expert declaration.  <u>See</u> Dkt. No. 805 at 6 (discussing that Dr. McCann's opinion purports to demonstrate that "each plaintiff suffered a substantial and immediate loss due to the very high, undisclosed costs of Allianz's annuity products." (citing to McCann Decl. ¶¶ 43, 49–50)).  The parties focus on this theory of "out-of-pocket" loss, because the Court tentatively concluded in <u>Midland</u> that a benefit of the bargain theory of damages is unavailable in a case like this one, based upon affirmative misrepresentations, not breach of contract.  <u>See</u> Dkt. No. 804 at 5-6, n. 4 ("Plaintiffs do not allege that Midland failed to provide the promised annuity; instead, plaintiffs allege that Midland failed to disclose facts regarding the costs of the annuity which, if disclosed, would have led any rational investor to choose another financial instrument.  Plaintiffs nonetheless received all that was promised to them."); <u>see also id.</u> at 23 ("plaintiffs' claims rest on their contention that they were deceived into purchasing the annuities through half-truths and misrepresentations in marketing materials rather [than] that Allianz breached the resulting contract.").

decision in <u>Bridge v. Phoenix Bond & Indemnity Co.</u>, 553 U.S. 639, 654 (2008).  Opp'n at 30.  As the Court has found previously, a RICO plaintiff alleging injury "by reason of" a defendant's misrepresentation will have to demonstrate that he relied on the misrepresentation.  <u>Bridge</u> established that a plaintiff need not show "first-party" reliance on a defendant's fraudulent acts to prevail, but the Supreme Court also noted that "none of this is to say that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations."  <u>Bridge</u>, 553 at 658; <u>see also id.</u> at 657 n. 6 ("Of course, a misrepresentation can cause harm only if a recipient of the misrepresentation *relies* on it.") (emphasis added); <u>cf. Basic Inc. v. Levinson</u>, 485 U.S. 224, 243 (1988) ("Reliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury.").  Thus, while plaintiffs are correct in arguing that reliance is not an "element" of a RICO claim, proof of reliance may be a necessary "'mile post on the road to causation.'"  Class Order at 14 (quoting <u>Poulos</u>, 379 F.3d at 664).  <u>See, e.g., In re Bextra & Celebrex Mktg. Sales Practices Litig</u>, 2012 WL 3154957, at *5-6 (N.D. Cal. Aug 2, 2012) (finding that a plaintiff must allege reliance on misrepresentations); <u>Friedman v. 24 Hour Fitness USA, Inc.</u>, 2009 WL 2711956, at *8 (C.D. Cal. Aug. 25, 2009) (finding that where the alleged misrepresentations are made directly to consumers, reliance is required); <u>Nat'l West. I</u>, 268 F.R.D. at 665 (noting that "it may well be in some cases a showing of reliance is one (if not the only) method of establishing causation").

Without proving reliance in some form, plaintiffs will be unable to demonstrate the causal linkage between the defendant's alleged misrepresentations and the class members' injuries.  <u>Id.</u> (citing <u>Poulos</u>, 379 F.3d at 665).  Again, as the Court in <u>Bridge</u> noted: "In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation"—let alone proximate causation.  553 U.S. at 659.  A class member generally has not suffered any *misrepresentation-related* injury

unless they actually relied on the misrepresentation—at least in some fashion—when making their purchasing decision.  Reliance is the "glue" that is necessary for plaintiffs' original theory of causation.[9]  To prove that "Allianz's alleged deceptive scheme proximately caused class members to suffer a concrete financial loss," plaintiffs must demonstrate that "class members made investment decisions based on material misinformation or omissions about the annuity products."  Dkt. No. 805 at 19.

In general, Allianz allegedly deceiving *at least some* seniors into buying annuities *because of* misrepresentations does not, in and of itself, "cause" other class members to suffer the same injuries just because they all purchased the same annuities.  However, at oral argument, plaintiffs pressed an alternative theory of causation that adopts a similar, but crucially different approach.[10]  The upshot of plaintiff's theory is this: because *at*

---

[9] Spencer v. Hartford Fin. Services Group, Inc., 256 F.R.D. 284, 297 (D. Conn. 2009), on which plaintiffs rely, is distinguishable.  In Spencer, plaintiffs alleged that they had been defrauded out of part of their settlement funds by an insurance company, who allegedly structured settlements such that plaintiffs received less than they were originally promised, with the defendant taking an undisclosed fifteen percent cut to recoup overhead and other fees.  Id. at 288.  Plaintiffs there expressly distinguished their case from the annuities context, arguing that the insurance company was violating its contractual obligation to pay the full coverage amount, unlike an annuity consumer who receives the full value that is promised to him pursuant to his contract with the issuer.  Id.  Crucially, the injury in Spencer was "*not* that plaintiffs would have rejected their settlements had they known of the alleged scheme, but rather that plaintiffs received less than the total amount which they agreed to receive in release of their claims."  Id. at 298.  Spencer found that after Bridge, the plaintiffs need not show individual reliance on the misrepresentations.  Unlike Spencer, plaintiffs here present a case where injury only results because of the misrepresentations; class members have no other expectation of a premium bonus, for example, save for the brochures alleging that they will receive a bonus.  A benefit-of-the-bargain theory of damages, like that employed in Spencer, is thus unavailable in this case.

[10] Furthermore, contrary to defendant's contentions, plaintiffs have not abandoned their original theory of causation and damages, but have instead refined their original theory to focus specifically on the overcharges that all class members allegedly suffered as a result of the alleged misrepresentations.  As when the Court first certified this class, continue...

*least some* members of the class "logically relied" on defendant's alleged misrepresentations, plaintiffs can demonstrate causation by way of an across-the-board price increase that class members suffered as a result of the misrepresentations. See Opp'n at 29, 46. That is, plaintiffs can demonstrate that class members paid for products that are worth less because Allianz's representations regarding the "full value", "bonus", and "no sales charges" were in fact misrepresentations or fraud. So long as at least some class members—and presumably, a large percentage of class members, although not every single one—were induced into purchasing Allianz products because of the alleged misrepresentations, the price of these annuities would be greater for everyone in the class, even those class members who did not rely on the misrepresentations. With at least some class members relying on the marketing representations that Allianz made, Allianz would be able to charge more for its products because a subset of consumers rationally believed they would receive all that was promised to them. As such, other class members who *did not* rely on these representations would also be harmed, because the reliance of some class members would allow Allianz to increase the price of the product for all—thereby overcharging all class members. And through their expert, Dr. McCann, plaintiffs have demonstrated that such an "overcharge" allegedly resulted from Allianz's misrepresentations. In other words, class members who did not rely on the misrepresentations would nonetheless suffer an out-of-pocket loss by being overcharged for Allianz annuities, even absent their reliance on the alleged misrepresentations.

The Court finds that this alternative theory is an acceptable way to prove RICO causation and injury—absent class-wide reliance—after Bridge. If all class members

---

[10]...continue

plaintiffs' alternative theory is premised upon standardized written presentations coupled with plaintiffs' class-wide method of proving that the annuities in question were worth less than class members paid for them at the time of purchase. Plaintiffs' alternative theory remains focused on these same standardized written presentations and the accompanying SOUs, in addition to Dr. McCann's methodology for demonstrating that the annuities in question were worth less than the prices that class members paid for them.

suffered an injury in the form of a price increase that resulted because at least some class members relied on defendant's misrepresentations, then class members' injuries would clearly have resulted "by reason of" defendant's allegedly fraudulent misrepresentations. As such, plaintiffs would be able to demonstrate proximate causation because at least some class members would have relied on defendant's misrepresentations. Whether proof of either theory can be shown on a class-wide basis and satisfy the predominance requirement is addressed in the section that follows.

## 2.   Predominance under Rule 23(b)(3)

The predominance inquiry "trains on legal or factual questions that qualify each class member's case as a genuine controversy." Amchem Prods, Inc. v. Windsor, 521 U.S. 591, 625 (1997); see also Poulos, 379 F.3d at 664. "When one or more of the central issues in the action are common to the class and can be said to predominate," a class action will be considered proper "even though other matters will have to be tried separately." Gartin v. S&M NuTec LLC, 245 F.R.D. 429, 435 (C.D. Cal. 2007). "Because no precise test can determine whether common issues predominate, the Court must pragmatically assess the entire action and the issues involved." Romero v. Producers Dairy Foods, Inc., 235 F.R.D. 474, 489 (E.D. Cal. 2006). The principle focus of the predominance inquiry is"the balance between individual and common issues." In re Wells Fargo Home Mortg. Overtime Pay Litig., 571 F.3d 953, 959 (9th Cir. 2009). "Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy." See Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir. 1996); In re Wells Fargo Overtime, 571 F.3d at 958 (achieving judicial economy is "an integral part of the predominance test").

### (a)   Individualized Proof of Reliance

Allianz's primary argument is that "individual issues predominate" as to whether any class member can prove reliance on the specific misrepresentations alleged. Mot. at 27. First, Allianz argues that plaintiffs are proceeding under a different theory of

causation and damages than the theory by which the class was certified.  Citing to numerous previous rulings of this Court and the transcripts of various proceedings, Allianz contends that plaintiffs' case is now "in the realm of individualized proof," because plaintiffs' theory requires demonstrating that specific alleged misrepresentations in a consumer brochure caused each class member harm.  Id. at 28-30.

Second, Allianz argues that although this Court initially certified the class under Polous's theory that reliance "provides the common sense or logical explanation" for class member behavior, Class Order at 16, this inference of reliance is no longer available based on plaintiffs' current theory of their case.  Mot. at 30.  The shortcut of a presumption of reliance does not apply to this case based on alleged affirmative misrepresentations, as opposed to omissions, Allianz argues.  Id. at 31 (citing Poulos, 379 F.3d at 666).  Moreover, Allianz contends that there are many reasons, in addition to the three representations that Allianz made in its marketing materials, for consumers to have purchased the annuities at issue.  Id. at 32.  For example, class members may have been motivated by "guaranteed contract performance," because annuities may "mitigate" consumers' exposure to "adverse changes in stock prices, interest rates, inflation, and mortality."  Id. at 32 (quoting Def.'s Ex 61 (Bodie Expert Report) at 781).  As such, defendant contends that no common sense inference of reliance is available.

Third, Allianz argues that no common proof is available to prove that each class member relied upon defendant's alleged misrepresentations or understood them as plaintiffs allege.  Mot. at 34.  Allianz points to this Court's prior order denying summary judgment as to Ow and Healey's RICO claims for the proposition that plaintiffs must prove "they were deceived into purchasing the annuities through half-truths and misrepresentations in marketing materials."  Dkt. No. 805 at 23.  Because no inference of reliance is available under Poulos to make this showing, Allianz argues, individual issues of proving the reliance of each class member on the alleged misrepresentations would predominate.  Mot. at 35.

Finally, even if the Court finds that a presumption of reliance is available in this case, Allianz contends that it is "entitled to rebut such an inference with individual class member facts."  Mot. at 36 (citing Dukes, 131 S. Ct. at 2560–61).  These defenses purportedly include whether an individual class member read the alleged misrepresentations and expected something more, as named plaintiffs did, and whether class members "regret" purchasing their annuities.  Id.  Because trial would be overwhelmed by the litigation of individualized questions, Allianz contends, predominance is not met.  Id. (citing In re St. Jude Med. Inc., 522 F.3d 836, 840 (8th Cir. 2008) (noting defendant's right to present evidence negating plaintiffs' circumstantial showing of causation).  In particular, defendant points to evidence of reliance regarding the named plaintiffs, Mot. at 37–38 (citing to Def.'s Exs. 63–65, Plaintiff's Responses to Def.'s First Set of Requests for Admissions); the possible representations made by agents during "hundreds of thousands" of agent-purchaser interactions, id. at 38-39; and the unique attributes and motivations of the individuals who purchased the annuities, id. at 40.

In opposition, plaintiffs argue that reliance is a "common issue" where there is an overarching fraudulent scheme involving uniform, standardized misrepresentations.  Opp'n at 36.  Plaintiffs cite a number of cases for the proposition that they need only show reliance on the scheme, not the particular misrepresentations themselves.  See, e.g., Robinson v. Fountainhead, 257 F.R.D. 92, 95 (D. Md. 2009); Friedman v. 24 Hour Fitness USA, Inc., 2009 WL 2711956, at *8 (C.D. Cal. August 25, 2009).  Plaintiffs argue that "[t]he existence of uniform class-wide misrepresentations contained in standardized selling documents is powerful evidence of aggregate reliance by class members."  Opp'n at 37 (citing Grider v. Keystone Health Plan, 2001-cv-05641, 2006 U.S. Dist. LEXIS 93085, at *64–67 (E.D. Pa. Dec. 21, 2006) (finding that it did not "strain credulity to conclude that each plaintiff. . . relied upon defendants' representations")).  Reliance by at least some class members on the alleged

misrepresentations that comprise the marketing scheme is sufficient, because this resulted in a price increase or overcharge for all class members, plaintiffs argue.

Second, plaintiffs contend that the SOU's that each class member executed provide direct proof of reliance in this case.  Id. at 38.  Plaintiffs argue that these SOU's present "compelling evidence" of reliance, "insuring cohesiveness" of the class, because by signing the SOU's "class members affirmed in writing that they relied on [these] standardized materials."  Id.

Third, plaintiffs argue that "causation can be demonstrated on a class-wide basis where the inference of reliance is the most logical explanation for class member behavior."  Id. at 40.  Because the "core features" and "fundamental nature" of the annuity products were misrepresented, plaintiffs posit, "logic and common sense compel the conclusion that the class members relied on the representations as part of the decision-making process."  Id. at 40 (citing Nat'l West I, 268 F.R.D. at 665 ("Consumers are nearly certain to rely on prominent. . . features of a product which they purchase.")).

Fourth, plaintiffs argue that reliance is not "disproven" in this case despite the fact that some class members may have bought an Allianz product anyway—with or without the alleged misrepresentations.  Opp'n at 43.  To show proximate cause under RICO, plaintiffs argue, they need only demonstrate that the injurious conduct was a "substantial factor" in causing their injury—not that the misrepresentations were the sole cause.  Id. at 44 (citing Oki Semiconductor Co. v. Wells Fargo Bank, N.A., 298 F.3d 768, 773 (9th Cir. 2002)).  Moreover, plaintiffs contend, they do not need to prove that "every class member would not have purchased the fraudulently overpriced Allianz annuity," because it is not necessary to show injury as to all class members at the class certification stage.  Id. at 45.  Even if a few class members suffered no injury, this does not defeat certification, plaintiffs argue, particularly where Allianz has not offered any evidence that class members did not rely on Allianz's alleged misrepresentations.  Id. at 46.

Finally, plaintiffs contend that purported divergent agent-class member interactions and individual class member attributes does not defeat the Court's previous finding of predominance.  As to the interactions with Allianz sales agents, plaintiffs contend that the SOU's that all the class members executed ensures the standardized presentations were not "disrupted" by any particular agent's interaction with a particular purchaser, as the agents attested in the SOU's that they did not make representations inconsistent with the marketing brochures.  Id. at 47.  As to class member sophistication and individual attributes, plaintiffs argue that these are irrelevant considerations, "given the central importance of the alleged misrepresentation and their direct adverse impact across all product features."  Id. at 48.  Plaintiffs note that even if class members purchased annuities because of the other benefits the products offered—such as safety of principal or tax-deferral—all equity-indexed annuities offer these features, and therefore these features cannot explain why seniors chose the allegedly sub-standard Allianz annuities instead.  Id. at 48, n. 35.

In reply, defendant argues that under RICO, plaintiffs must do more than show that the alleged misrepresentations were a "substantial factor" in their purchasing decisions, distinguishing First Alliance as a case governed by California law.  Reply at 8.  Moreover, Allianz contends that In re Nat'l W. Life Ins. Deferred Annuities is distinguishable as well, because the court there dismissed defendant's "merits" arguments as inapplicable to the Rule 23 question.  Id. at 9, n. 11.

More importantly, defendant argues, plaintiffs conflate their ability to prove damages based on each alleged misrepresentation with their burden of proving causation.  Reply at 11.  Plaintiffs must prove class-wide reliance but the "common sense inference" of reliance articulated in Poulos is not available in this case, defendant argues.  Id. at 13.  This inference only applies in cases based upon a "failure to disclose," like securities cases, not a case like this one where affirmative misrepresentations are at issue.  Id.  Because there is more than one possible motivation for the class members'

purchasing decisions, Allianz argues, and because rational seniors may have interpreted the alleged misrepresentations in different ways, causation cannot be inferred through class-wide circumstantial evidence. Id. at 14–15. Defendant also focuses on answers made in response to requests for admission and the deposition testimony of the two named plaintiffs. Reply at 22–24. Plaintiff Ow "denied" defendant's request that he admit he read the SOU before he signed it, while also denying that the SOU was "relevant." Def.'s Ex. 65. In addition, plaintiff Healey stated she is "without knowledge as to whether she read a so-called SOU," while also denying its relevance. Def.'s Ex. 64; see also Def.'s Ex. 13 at 77:19–22 (Healey Depo.) (plaintiff testifying that she could not recall if the brochure had any effect on her decision). Allianz further argues that this Court's prior order—denying Allianz's motion for summary judgment on the reliance element of the named plaintiffs' RICO claims, because plaintiffs presented "substantial evidence of reliance on Allianz's sales materials," Dkt. No. 805 at 20—precludes any class-wide method of proving reliance for all of the other members of the class, since the presence or absence of such reliance will be a question of fact for every single member of the class.

At the outset, the Court notes that many of the liability questions in regards to plaintiffs' RICO claims can be resolved on a class-wide basis, including whether defendant was part of an association-in-fact enterprise operating an alleged scheme to defraud the class members. Proving these allegations will involve the same evidence and manner of proof as to the entire class. See, e.g., Robinson v. Fountainhead Title Group Corp., 257 F.R.D. 92, 94 (D. Md. 2009). In addition, the truth or falsity of the three alleged misrepresentations can readily be determined through common proof. See Nat'l West I, 268 F.R.D. at 664.[11] The issue of causation, however, potentially presents

---

[11] Plaintiffs' current out-of-pocket loss damages theory does not depend on whether individual class members surrendered their policies or annuitized them; as such, these issues can be resolved on a class-wide basis, as plaintiffs contend. Moreover, what continue...

the need for individualized inquiries that could predominate over the common elements necessary for establishing RICO liability.

Next, although more than five years have passed since this Court first certified the class at issue in this litigation, the Court finds that the basic legal framework governing this case remains much the same, starting with the Ninth Circuit's decision in Poulos. In Poulos, plaintiffs attempted to certify a RICO class action challenging an alleged scheme to defraud casino patrons who used video poker or electronic slot machines in a certain time period. 379 F.3d at 659. Plaintiffs' allegations in Poulos were premised on the fact that the casino operators made various misrepresentations in the appearance and labeling of the machines, which made it appear the machines operated according to chance—whether through decks of cards or mechanical levers—but in fact the odds of winning were "rigged" to the house's advantage by a computer algorithm. Id. at 659–61, 665. The district court found, and the Ninth Circuit affirmed on review, that "individualized reliance issues related to proof of causation would predominate over common questions," precluding certification under Rule 23(b)(3). Id. at 664. Although this case was decided before Bridge, the court did not find that reliance was always required to prove causation, but that the plaintiffs in Poulos had to prove reliance "[t]o connect the dots between the bare allegations and the injury." Id. ("The misrepresentations standing alone have little significance."). The Poulos plaintiffs would be unable to make this showing on a class-wide basis, the court found, because

---

[11]...continue

individual class members understood the alleged misrepresentations to mean is irrelevant to plaintiffs' RICO claims. Determining whether or not a statement is a fraudulent representation is an objective inquiry that can be made on a class-wide basis. Similarly, Allianz's argument that it must be provided the opportunity to inquire as to whether individual consumers "regret" their purchase of an Allianz annuity is unavailing. Mot. at 36. This is not a relevant inquiry for purposes of class certification. Instead, the issue is whether Allianz made materially false or misleading statements to class members in furtherance of a scheme to defraud.

"individualized reliance issues related to plaintiffs' knowledge, motivations, and expectations bear heavily on the causation analysis. . . [d]ue to the unique nature of gambling transactions and the allegations underlying the class claims." Id.[12]

Poulos then addressed whether a presumption of reliance is available in a civil RICO action predicated on mail fraud. The court noted that a presumption of reliance is traditionally only available in cases involving securities fraud, and even then, only in "cases based on omissions as opposed to affirmative misrepresentations." Id. at 666 (further noting that the presumption is also not available in cases involving a mix of misrepresentations and omissions (citing Binder v. Gillespie, 184 F.3d 1059, 1064 (9th Cir. 1999)). In addition, the court also rejected plaintiffs' theory of causation based on a "common sense" inference or "logical explanation" that links the affirmative misrepresentations to the class members' use of the gambling machines. Id. at 667–68. Without a "single, logical explanation for gambling," Poulos held that such a common sense presumption could not be applied. Id. at 668.

Plaintiffs' argument that they have "direct" proof of reliance by way of the signed SOU's only goes so far. As the Court found previously, these SOUs are compelling evidence that all the class members were exposed to standardized written presentations,

---

[12] The Poulos court provided an illustration of this as follows:

A plaintiff claiming that the Casinos' misrepresentations caused her to play electronic slot machines and suffer losses must do more than merely allege causation; she must draw a causal link between the alleged fraud and the alleged harm. The plaintiff might draw this link by proving that the Casinos' failure to inform players that the electronic slot machines operate differently than their mechanical counterparts affected her decision to play, or that she was influenced by the fact that electronic slot machines look like traditional slot machines. In turn, this would require her to establish that she was aware of how the mechanical slot machines operated, was unaware that the electronic slot machines operated differently than those machines, and was motivated to play the electronic slot machine based on her knowledge of these factors. Id.

as each class member attested to the fact that he or she had read and understood the information set forth in the marketing brochures.  Class Order at 17; see Nat'l West I, 268 F.R.D. at 664.  Allianz's arguments and its evidence submitted with this motion does nothing to challenge this significant uniformity in how the alleged misrepresentations were presented—by design—to the class.  See Pls.' Ex. 7, 7/13/06 Field Depo. 553:24–554:17, 556:12–557:11; Ex. 38 (Agent Compliance Guide).[13] However, as the Court noted in its Class Order, these standardized presentations could establish proximate causation only when "coupled with" plaintiffs' allegations that the Allianz annuity products at issue are "far less valuable than other comparable products" or are worth far less than what class members paid for them.  See Class Order at 17. Therefore, plaintiffs' direct evidence of reliance is insufficient, standing alone to establish the causal link between the misrepresentations at issue and the harm suffered by class members, and plaintiffs must rely on a method of class-wide proof in addition to the SOUs.

Plaintiffs seek to utilize the second and distinct method of class-wide proof set forth in Poulos, that causation can be demonstrated on a class-wide basis because reliance on defendant's alleged misrepresentations is the "common sense" or "logical explanation" for class members' purchasing decisions.  379 F.3d at 667–68.[14] Importantly, plaintiffs still allege that "Allianz annuities are inferior in value and performance to alternative investment products."  Opp'n at 13.  And plaintiffs appear to

---

[13] This includes Allianz's contentions that variations in agent-class member interactions preclude a finding of predominance.  This case is distinguishable from Countrywide II, 2011 WL 6325877, at *5, where the sales agents had not signed any document attesting to the fact that they made no further representations or qualifications from the contracts or brochures at issue.

[14] Contrary to defendant's contentions, Reply at 14, plaintiffs do not seek to avail themselves of the Affiliated Ute presumption of reliance that this Court rejected in its prior class order, Class Order at 14.

contend that the Allianz annuities are comparatively inferior to other investments even without the alleged misrepresentations at issue in this litigation.  For example, plaintiffs contend that the MasterDex 10 has a value of only 83 cents for every dollar of premium paid, a deficiency that Dr. McCann now disaggregates as resulting from each of Allianz's three alleged misrepresentations.  Id. at 13–14 (citing Ex. 21, McCann Decl . ¶ 74).  Of course, plaintiffs are not contending that the comparative inferiority of Allianz annuities itself amounts to a RICO violation; the alleged RICO violation is Allianz's misrepresentation of the "true value" of the annuity products.  Therefore, plaintiffs argue that if this "true value" was not hidden behind the alleged misrepresentations, "the jury in this case [could] reasonably infer that class members would have acted differently." Opp'n at 14.

The Court agrees—resort to the "common sense" inference for proving class-wide reliance remains appropriate in this case.  That Allianz annuities are allegedly inferior in value and performance to comparable investment products, including similar equity-indexed annuities, gives rise to an inference that consumers decided to purchase the "inferior" annuities because of the standardized marketing materials at issue in this litigation, for they otherwise had no reason to do so.  "Consumers are nearly certain to rely on prominent (and prominently marketed) features of a product which they purchase," Nat'l Western I, 268 F.R.D. at 665, particularly where there are not otherwise compelling reasons for purchasing a product that is allegedly worth less than the purchase price.[15]  If Allianz annuities offer the same benefits as equity-indexed annuities

---

[15] In Kelley v. Microsoft Corp., 395 F. App'x 431 (9th Cir. 2010) (mem. op.), the Ninth Circuit reversed the district court's order denying certification of a consumer class under the Washington Consumer Protection Act ("CPA"), Wash. Rev.Code § 19.86.010 et seq., which requires individualized proof of proximate causation.  The Kelley court remanded to district court for reconsideration of its order under Polous, because the court found that class certification may be appropriate where "the allegedly fundamental aspects of the product . . .are largely encompassed within the alleged misrepresentation."  Id. at

continue...

offered by other issuers, but are of lesser value than annuities from other issuers at the moment of purchase, then a jury could infer on a class-wide basis that defendant's allegedly fraudulent marketing scheme is the cause of plaintiffs' injuries. See, e.g., Minter v. Wells Fargo Bank, N.A., 274 F.R.D. 525, 546 (D. Md. 2011) (affirming class-wide demonstration of reliance based upon a common sense inference similar to that discussed in Poulos).[16]

Allianz's reliance on Countrywide I & II is thus to no avail. For the reasons previously discussed, Judge Sabraw distinguished this case, among others, because the home mortgage loan sales agents in Countrywide did not attest to the fact that they made no additional statements beyond those contained in the standardized loan documents.[17] In addition, the court found that the plaintiffs in Countrywide had many possible motivations for entering into a home mortgage loan transaction, such that "the common

---

[15]...continue 432.

[16] Allianz's argument with respect to the Court's prior order denying summary judgment goes too far. The Court's order stands for no more than the proposition that defendant failed to disprove reliance by the named plaintiffs as a matter of law—defendant was the only party moving for summary judgment on this issue. What the Court found was that plaintiffs had presented "substantial evidence of reliance," including their "uncontroverted execution of the SOU's," and that such evidence precluded a grant of summary judgment in defendant's favor. Dkt. No. 805 at 20. In addition, the Court noted that "plaintiffs' execution of the SOUs could adequately establish proximate causation"—not just for the named plaintiffs, but for the class as a whole. Id. As such, the Court's prior order does not preclude plaintiffs' from asserting either of their theories for proving causation on a class-wide basis. Whether such causation can be proven on a class-wide basis remains a question for the trier of fact to resolve.

[17] Similarly, Allianz's citation to In re St. Jude Med., Inc., 522 F.3d 836 (8th Cir. 2008) is unpersuasive. There, the Court found that the defendant "presented evidence that a number of implant patients did not receive *any* material representation about the heart valve," and there were also no similar attestations of reliance on the marketing materials as is at issue in this case. Id. at 838 (emphasis in original)

sense approach to causation does not apply." Countrywide I, 277 F.R.D. at 604 (citing Poulos, 379 F.3d at 667–68). Without the common marketing campaign and the distinct deficiencies in the consumer products at issue that plaintiffs have identified in this case, the court in Countrywide properly found that class certification was inappropriate. Unlike the unwieldy variations in class members' motivation to gamble at issue in Poulos, plaintiffs here comprise a defined universe of individuals who purchased specific products, with specific features that were allegedly of less value than defendant's standardized marketing materials promised them. A commonsense or logical inference for proving reliance class-wide remains available in this case.

In addition, the Court concludes that plaintiffs' alternative theory of causation—of a uniform price increase or overcharge suffered by all members of the class—could also prove class-wide causation after Bridge. As with plaintiffs' original theory, plaintiff will need to prove that at least some class members relied on defendant's alleged misrepresentations. Plaintiffs can make this showing on a class-wide basis in the same manner as discussed above in relation to plaintiff's original theory for proving causation. To wit, the signed SOUs attesting to class members' reliance on the misrepresentations, coupled with Dr. McCann's expert testimony that Allianz annuities are worth less than what class members paid for them at the moment of purchase, provides for a "common sense" inference that at least some class members relied on Allianz's alleged misrepresentations. This is precisely what the Court found in its original Class Order. As plaintiffs aptly note, "at a minimum, wide swaths of the annuity purchasers logically relied on Allianz's uniform and targeted misrepresentations. . . representations that served no purpose other than inducing them to buy." Opp'n at 46.

Because proof that at least some class members relied on the alleged misrepresentations can be shown on a class-wide basis, plaintiffs could demonstrate that all class members were injured by defendant's alleged misrepresentations through a price increase or overcharge. In this way, issues common to the class as a whole

regarding Allianz's liability would clearly predominate over individual issues, because a price increase due to Allianz's misrepresentations would cause injury to all class members in the form of an out-of-pocket loss.  Moreover, for class members only exposed to two of the three alleged misrepresentations, Dr. McCann has isolated the price increase or overcharge resulting from each misrepresentation independently, such that causation can be proven for each subset within the class.

Plaintiffs' theories may no doubt be difficult to prove, and are heavily dependent on expert evidence demonstrating through complex statistical and financial modeling that all members of the class were overcharged for their annuities because of Allianz's alleged misrepresentations.  However, despite these complexities, it is not the Court's role on a motion for certification to conclusively weigh or decide the merits of plaintiffs' theories, but instead to determine whether such theories could prove causation on a class-wide basis at trial.  Because the Court finds that either theory, if credited, could do so, the Court need inquire no further for purposes of this motion.

### (b)    Other Individualized Issues

Allianz argues because not all FMOs are considered a part of the pared-down alleged RICO enterprise, every class member who purchased an annuity from a non-enterprise FMO bears the additional burden of proving a RICO injury by reason of a "non-enterprise transaction."  Mot. at 41.[18]  Allianz contends that individualized inquiries would be required to determine which class member sales by non-enterprise FMOs could be said to have occurred by reason of the alleged enterprise.  Id.  In addition, Allianz contends that state law differences also preclude a finding of predominance, including state specific regulatory requirements and the question of

---

[18] Allianz makes this point more fully in its Third Motion for Summary Judgment, filed concurrently, arguing that those class members who did not purchase an Allianz annuity from an enterprise FMO were not a "direct victim" of the RICO violations allegedly committed by the enterprise.

whether certain class members' claims are reverse-preempted under the McCarran-Ferguson Act.  Id. at 42–45.

The Court notes that these arguments were readily available to defendant at the initial class certification stage, and Allianz has not given the Court reason to revisit its prior determination on these new grounds.  Moreover, these arguments can be addressed in Allianz's pending motions for summary judgment and judgment on the pleadings, and the impact on class certification of these state law issues can be determined after the Court rules on these motions.

Because the Court finds that plaintiffs offer a method for demonstrating reliance and causation on a class-wide basis, the Court finds that common issues predominate over individualized ones.  See In re Wells Fargo Overtime Pay Litig., 571 F.3d at 959.

## V.     CONCLUSION

In accordance with the foregoing, Allianz's motion to decertify the class is hereby DENIED.

IT IS SO ORDERED.

Dated: December 27, 2012

_Christina A. Snyder_

CHRISTINA A. SNYDER
United States District Judge